# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

JIMMY LUCERO,

      Plaintiff,

vs.                                                                 No. CIV 20-0311 JB\JHR

BOARD OF DIRECTORS OF JEMEZ
MOUNTAINS COOPERATIVE, INC.;
DONNA MARTINEZ; ALFONSO
MARTINEZ, JR.; RANDY VIGIL;
CARLOS SALAZAR;

      Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on: (i) Counter-Plaintiff Salazar's Motion for Default Judgment, filed April 7, 2020 (Doc. 14)("Motion for Default"); (ii) Defendants Martinez and Salazar' [sic] Partial Motion to Dismiss and Memorandum in Support Thereof, filed April 13, 2020 (Doc. 4)("MTD"); and (iii) Motion to Amend Petition, filed June 24, 2020 (Doc. 37). The Court held hearings on June 25, 2020, and July 29, 2020. See Clerk's Minutes at 1, filed June 25, 2020 (Doc. 39); Clerk's Minutes at 1, filed July 30, 2020 (Doc. 47). The primary issues are: (i) whether the Court should enter default judgment on behalf of Counter-plaintiff Carlos Salazar, because Plaintiff and Counter-Defendant Jimmy Lucero did not respond to Defendant and Counter-plaintiff Salazar's Answer to Plaintiff's Complaint for Breach of Contract, Breach of Covenant of Good Faith and Fair Dealing, Negligent Supervision, Retention and Training, Discriminatory Discharge Based on Violation of Human Rights Act, Retaliatory Discharge Against Public Policy Violation and Intentional Infliction of Emotional Distress and Counterclaim for Battery and Assault, filed April 7, 2020 (Doc. 1-4)("Counterclaim"), filed within the thirty-day

time limit for answering a counterclaim as N.M. R. Ann. 3-301 requires; (ii) whether the Court should dismiss Count III -- a prima facie tort claim -- of Lucero's Complaint for Breach of Contract, Breach of Covenant of Good Faith and Fair Dealing, Negligent Supervision, Retention and Training, Discriminatory Discharge Based on Violation of Human Rights Act, Retaliatory Discharge Against Public Policy Violation and Intentional Infliction of Emotional Distress and Counterclaim for Battery and Assault, filed April 7, 2020 (Doc. 1-2)("Complaint"), against Defendant Alfonso Martinez, Jr. and Salazar, because Count III does not allege that Martinez or Salazar hired, supervised, or retained employees who abused Lucero; (iii) whether the Court should dismiss the Complaint's Count IV, which alleges discriminatory discharge in violation of the New Mexico Human Rights Act, N.M. Stat. Ann. § 28-1-7(A)("NMHRA"), against Martinez and Salazar, because Lucero does not allege that either Martinez or Salazar were involved in his discharge or even had the authority to discharge him; (iv) whether the Court should dismiss Count V of Lucero's Complaint against Martinez and Salazar, because Lucero does not allege that Martinez and Salazar were involved in Lucero's discharge, and because Count V alleges retaliatory discharge, which is available under state law only for at-will employees; (v) whether the Court should dismiss Lucero's intentional infliction of emotional distress claim, because § 301 of the Labor Management Relations Act, 29 U.S.C. § 185(a) ("LMRA") precludes the claim; and (vi) whether the Court should grant Lucero leave to amend his Complaint to make specific allegations against Martinez and Salazar.  The Court concludes that: (i) it will not enter default judgment, because the Clerk of the Court has not entered default and default is not appropriate given that the parties were in communication, the Petitioner's Response to Defendant Salazar's Counterclaim for Assault and Battery, filed April 7, 2020 (Doc. 1-5)("Counterclaim Response"), was filed five days after the deadline, and Salazar alleges no prejudice to himself; (ii) it will dismiss Count III against

Martinez and Salazar without prejudice, because Lucero does not mention Martinez and Salazar in the Count, despite mentioning another supervisor by name, nor does Lucero make specific allegations against Martinez and Salazar; (iii) it will dismiss Count IV against Martinez and Salazar with prejudice, because Lucero did not exhaust his administrative remedies against Martinez and Salazar; (iv) it will dismiss Count V against Martinez and Salazar with prejudice, because Lucero is not eligible to make a retaliatory discharge claim as an employee protected by a Collective Bargaining Agreement ("CBA"); (v) it will dismiss Count VI without prejudice, because Lucero does not make sufficiently specific allegations for the Court to determine whether there was outrageous conduct and whether the LMRA's § 301 precludes the claim; and (vi) it will allow Lucero to file a motion to amend his Counts III and VI, because amendment would not be futile for those claims.

## FACTUAL BACKGROUND

The Court takes its facts from the Complaint. The Court provides these facts for background. It does not adopt them as the truth, and it recognizes that these facts are largely Lucero's version of events.

From October, 2015, through March, 2017, Lucero served as a tree crew laborer for Jemez Mountain Electric Cooperative ("Jemez Cooperative"), at Jemez Cooperative's Española, New Mexico, location. See Complaint ¶ 29, at 7. From March 14, 2017 to January, 2018, Lucero was an apprentice in the International Brotherhood of Electrical Workers' ("IBEW") apprenticeship program at Jemez Cooperative. Complaint ¶¶ 9, 14, 29 at 3-4, 7. Jemez Cooperative "is a domestic rural electric cooperative" that is incorporated in the State of New Mexico, and it has several locations throughout New Mexico. Complaint ¶ 10, at 3. Defendant Board of Trustees of Jemez Cooperative "is accountable for ensuring implementation and adherence to policies that insure the

proper management, administration, and regulation of Jemez Cooperative's business."  Complaint ¶ 12, at 4.  Jemez Cooperative "had the power to direct Plaintiff's work activities," "the authority to hire, transfer, and discharge employees," "the responsibility to direct" employees, and "broad discretionary authority over decisions that ultimately determine Jemez Cooperative's policy regarding the actions alleged."  Complaint ¶ 13, at 4.

Defendant Donna Montoya-Trujillo serves as Jemez Cooperative's general manager and is responsible for ensuring "a work place free from harassment and discrimination based on protected status guaranteed to the Plaintiff pursuant to the New Mexico Human Rights Act and Title VII of the Civil Rights Act."  Complaint ¶ 15, at 4.  As Jemez Cooperative's general manager, Montoya-Trujillo "was charged with the day-to-day management of Jemez Cooperative"; "is accountable to the Jemez Cooperative" Board of Trustees; "had the power to direct personnel; was responsible for preventing injury to employees by establishing and maintaining a workplace free from unsafe conditions and by integrating safe and healthy attitudes into the work processes"; and "had the authority to train and supervise employees; review performance and training of employees and reassign and replace employees and at all relevant times [] had broad discretionary authority over decisions regarding the actions alleged."  Complaint ¶ 16, at 4-5.  Defendant Dwight Herrera is Jemez Cooperative's human resource administrator, who "had the power to direct Plaintiff's activities and the authority to hire, transfer, and discharge employees, or the responsibility to direct them, and at all relevant times alleged herein had broad discretionary authority over decisions regarding the actions alleged."  Complaint ¶ 17, at 5.  Defendant Randy Vigil is a lineman supervisor and Lucero's direct supervisor at Jemez Cooperative.  See Complaint ¶ 18, at 5.  As a lineman supervisor, Vigil "had the power to direct Plaintiff's activities, evaluate Plaintiff and the activities of other employees, had the power and responsibility to report the alleged abuse,

harassment and discrimination to Jemez Cooperative and its agents and had broad discretionary authority over the actions alleged."  Complaint ¶ 18, at 5.

Martinez is a journey lineman at Jemez Cooperative and one of Lucero's coworkers.  See Complaint ¶ 19, at 5.  Martinez also serves as a union steward and as a local union vice-president for IBEW.  Complaint ¶ 19, at 5.  Martinez is "subject to the policies set forth by Jemez Cooperative," and, as a union steward, "Martinez has the authority to ensure a workplace is free from harassment and discrimination and bring workplace issues forth to the attention of management per IBEW's CBA."  Complaint ¶ 19, at 5.  Salazar is a working foreman at Jemez Cooperative and one of Lucero's coworkers.  See Complaint ¶ 20, at 5.  He is "subject to Jemez Cooperative's policies."  Complaint ¶ 20, at 5.

All of the Defendants "are the agents, employees, licensee or assignees of Jemez Cooperative and in doing the things herein alleged acted within the course and scope of such agency, employment, assignment, license, invitation and/or relationship and with the full knowledge and consent of the remaining."  Complaint ¶ 22, at 6.  Further, the Defendants "also acted at times outside the scope of their authority."  Complaint ¶ 23, at 6.

Lucero "did not receive any discipline actions from Jemez Cooperative" from 2014 to 2017.  Complaint ¶ 30, at 7.  On or about June 21, 2017, another employee pushed Lucero after Lucero "accidentally dropped a line."  Complaint ¶ 31, at 7.  Vigil was present during the incident, but he did not intervene.  Complaint ¶ 31, at 7.  Electing not to take a statement from Lucero about the incident, an unnamed person at Jemez Cooperative "sent [Lucero] home on four days paid leave while Jemez Cooperative purportedly investigated the allegations."  Complaint ¶ 31, at 7.  On March 14, 2018, Montoya-Trujillo, Vigil, and Herrera met with Lucero to discuss the incident.  See Complaint ¶ 31, at 7-8.  At the meeting, they instructed Lucero not to let distractions interfere

with his focus, and Vigil asked Lucero to apologize to a group of Lucero's coworkers for the incident.  See Complaint ¶ 31, at 8.   Lucero agreed to apologize to his coworkers -- although he did not think he had anything for which to apologize -- because he "was under the fear of retaliation."  Complaint ¶ 31, at 8.  At some later point, Lucero "told his fellow employees he wished they could all just get along because he needed to be employed to support his children."  Complaint ¶ 31, at 8.  The employee who pushed Lucero was not disciplined.  See Complaint ¶ 31, at 7.

On February 22, 2018, Lucero and his coworkers stopped at a gas station for "a paid meal period" breakfast on their way to a job.  Complaint ¶ 32, at 8.  At the gas station, Lucero told Salazar about the overtime hours that he had worked the prior weekend, stating that "he was going to make a good check that week."  Complaint ¶ 32, at 8.  Phillip Benavidez, another journeyman lineman, stated that Lucero's calculations were incorrect, and that Lucero "needed to go back to school."  Complaint ¶ 32, at 8.  When Lucero asked Benavidez why Benavidez insisted on "degrad[ing]" Lucero in front of other people and insulting Lucero instead of telling other people the ways in which Lucero helped Benavidez, Benavidez stood up, approached Lucero, and said "'fuck you'" and that he would "'fucking kick [Lucero's] ass.'" Complaint ¶ 32, at 9 (alteration in Complaint).  Lucero responded that he wanted to protect his job and thus was not looking to fight Benavidez, and Benavidez sat down.  See Complaint ¶ 32, at 9.  Lucero, however, "was in fear of his physical safety" and "of being attacked."  Complaint ¶ 32, at 9.  After finishing his breakfast, Lucero passed Benavidez on his way back to his company vehicle, and he said to Benavidez: "'I am trying to protect myself.  [W]hy are you harassing me all the time.'"  Complaint ¶ 32, at 9.  He also asked Benavidez, if Benavidez was planning on "do[ing] something to" Lucero, that Benavidez do so "not [] on the job, as [Lucero] had a job to protect."  Complaint ¶ 32, at 9.  Lucero

- 6 -

"felt threatened" during this incident.  Complaint ¶ 32, at 9.  Salazar, the working foreman on the

job, did not intervene.  Complaint ¶ 32, at 9.  Vigil and Montoya-Trujillo met with Salazar about

the incident and sent him home on paid leave while they investigated the incident.  See Complaint

¶ 32, at 9.  Upon Lucero's return, Herrera, Vigil, and Christine Chavez, a union steward, gave

Lucero a written warning.  Complaint ¶ 32, at 9.  Although the written warning was supposed to

stay in Lucero's file for only six months, Jemez Cooperative did not remove the warning after six

months and relied on it in part to justify Lucero's termination.  Complaint ¶ 33, at 9-10.

On November 7, 2018, Lucero took a day off work that Vigil had approved.  See

Complaint ¶ 34, at 10.  Because Lucero did not notify Martinez and Salazar of his absence,

Martinez and Salazar sent Lucero text messages consisting of "sexual innuendo and inappropriate

attacks and harassment."  Complaint ¶ 34, at 10.  "This incident was reported, but nothing ever

came of it."  Complaint ¶ 34, at 10.

On November 29, 2018,

Plaintiff and his working foreman, Carlos Salazar along with a fellow-
coworker, Alfonzo Martinez, who is a local union official, together approached
and engaged in at first verbal, written confrontation then physical confrontation
with Plaintiff.  Some of their conversation was captured by text messages sent
from Mr. Salazar to the Plaintiff's cell-phone.  Plaintiff asserts it was
Mr. Salazar and Mr. Martinez who were the aggressors and acted with hostility
and violence, whereby Carlos Salazar pushed Plaintiff while on the job site,
commit[ing] battery of Plaintiff.

Complaint ¶ 35, at 10.  When Lucero complained to Herrera about the incident, Herrera asked

Lucero to write a statement about the incident, which Lucero wrote and gave to Jemez Cooperative.

See Complaint ¶ 36, at 10.[1]  After Lucero provided his statement, no Jemez Cooperative employee

---

[1]Lucero says that this incident occurred in both 2018 and 2019.  Because Lucero was
terminated before November, 2019, the Court concludes that the incident occurred in November,
2018.

took any action regarding the statement.  Complaint ¶ 37, at 11.  Lucero argued that, after the November, 2018, incident, Martinez wanted Lucero to be fired, and to get Lucero fired, he inserted negative comments in Lucero's work evaluations in the "Daily Job Training Logs."  Complaint ¶ 34, at 10.  In November, 2018, Martinez stated that Lucero should be rotated or removed from his position as apprentice lineman, although none of Lucero's evaluations before November, 2018, indicated that he should be rotated or removed from his position.  See Complaint ¶ 36, at 11.  In the November, 2018, log, which was prepared in December, 2018, Martinez stated that he did not trust Lucero enough to be "his bucket buddy," "which means he does not trust working with Plaintiff in high-risk situations."  Complaint ¶ 36, at 11.  In the December, 2018, log, which was prepared in January, 2019, a different journeyman named Bustos indicated that Lucero's performance was improving and responded "no" to the question whether Lucero should be rotated or removed from his position.  Complaint ¶ 36, at 11.

Martinez asked that Lucero be removed from his position, because Lucero "objected to Martinez's sexual harassment and complained about it to management."  Complaint ¶ 37, at 11.  Both Martinez and Vigil have, at various times, accused Lucero of being gay and of acting like a woman.  See Complaint ¶ 38, at 11.  At one point, Lucero's "supervisor" called Lucero when Lucero was out sick to ask Lucero whether he had recovered from his hysterectomy.  Complaint ¶ 39, at 12.  These incidents "have caused severe emotional and mental distress to the extent that Plaintiff feared he would lose his job and has resulted in anxiety and worry to the extent he has had to miss work and seek medical attention."  Complaint ¶ 40, at 12.  None of the Defendants investigated these incidents, or corrected and trained the employees after these incidents.  See Complaint ¶ 41, at 12.  "Repeatedly, Cooperative employees acted contrary to Jemez Cooperative policies and yet Jemez Cooperative did not terminate these tortfeasors, did

not train them or correct the wrongdoing by these employees."  Complaint ¶ 42, at 12.  On January 31, 2019, Jemez Cooperative fired Lucero for alleged "just cause," describing Lucero "as being physically and verbally abusive with co-workers and front-line managers" and having "excessive unscheduled absences in April, 2018."  Complaint ¶ 44, at 12.  The Notice of Termination cites three incidents to justify termination: a June 21, 2017, incident, a February 22, 2018 incident, and a November 29, 2018, incident.  See Complaint ¶ 46, at 12-13.

## PROCEDURAL BACKGROUND

Lucero filed his Complaint in the State of New Mexico's First Judicial District Court, where it was docketed as case number D-117-CV-2020-00018.  See Civil Cover Sheet, filed April 7, 2020 (Doc. 1-1).  On April 7, 2020, Martinez removed the case to federal court.  See Notice of Removal, filed April 7, 2020 (Doc. 1).  The case was assigned to the Court on May 11, 2020, see Notice of Assignment, filed May 11, 2020 (Doc. 20)(text-entry only), and the Court has held two hearings on this case, see Clerk's Minutes at 1, filed June 25, 2020; Clerk's Minutes at 1, filed July 30, 2020.

1.      **Lucero's Complaint.**

In his Complaint, Lucero details that he was a Jemez Cooperative employee in Jemez Cooperative's Espanola, New Mexico location.  See Complaint ¶ 10, at 3.  He describes Martinez as Lucero's "coworker," who is a "Journeyman Lineman" at Jemez Cooperative and a "union steward and local union vice-president for" IBEW, which means that, pursuant to IBEW's CBA, he "has the authority to ensure a workplace is free from harassment and discrimination and bring workplace issues forth to the attention of management."  Complaint ¶ 19, at 5.  Lucero describes Salazar as his "coworker," whose job title is "Working Foreman."  Complaint ¶ 20, at 5.

Before beginning his substantive factual allegations, Lucero notes that he exhausted administrative remedies, because "he has filed a complaint with the New Mexico Human Rights Division who have issued an order of non-determination in this matter." Complaint ¶ 28, at 7. Lucero titles his first claim at "breach of contract -- *just cause required* per collective bargaining agreement." Complaint at 13 (emphasis in original). He alleges that the CBA's Section V states that Jemez Cooperative can discharge its employees only for just cause. <u>See</u> Complaint ¶ 48, at 13. He argues that his employer did not have just cause to terminate him and that the "Defendants presented false and fabricated facts in support of the decision to fire" Lucero. Complaint ¶ 50, at 13.[2] He notes that his termination also was a violation of the personnel manual incorporated into the CBA. <u>See</u> Complaint ¶ 51, at 13. Lucero alleges that the Defendants, in addition to breaching the CBA, also violated the Family Medical Leave Act, 29 U.S.C. § 2601 ("FMLA") when Lucero requested FMLA leave. Complaint ¶ 51, at 13. He also alleges at the end of Count II that IBEW "colluded with management officials and employees of Cooperative to sanction and authorize" his termination and "breached its duty of fair representation to" Lucero. Complaint ¶¶ 55-56, at 14.

Lucero then moves to his second claim of relief, which he titles "breach of covenant of good faith and fair dealings." Complaint ¶ 58, at 14. In this claim, he alleges that Jemez Cooperative breached its duty of good faith and fair dealing inherent in its contract by "discriminatingly enforcing its Personnel Policies manual and the CBA." Complaint ¶ 58, at 14. He does not elaborate on how it discriminatorily enforced its policies and the CBA beyond stating

---

[2]Throughout the Complaint, Lucero states "Defendant" or "Defendants" without specifying to which Defendants he is referring. When the Court can, with certainty, discern to which Defendant or Defendants Lucero is referring, it does so.

that Cooperative terminated Lucero shortly after Lucero retained legal counsel.  See Complaint ¶ 65, at 16.  He also adds that the Department of Labor[3] concluded that Cooperative violated FMLA.  See Complaint ¶ 66, at 16.

Lucero turns to his third claim, which he titles "prima facie tort -- negligent retention and training of management."  Complaint at 16.  In this claim, Lucero states that the "Defendants negligently permitted Plaintiff's supervisors and co-workers to harass him," which he says is inapposite with a standard of a reasonable supervisor and with the standard of Jemez Cooperative's own policies.  Complaint ¶ 69, at 16.  He further states that the "Defendants" negligently trained, retained, and supervised the "Plaintiff's supervisors," which resulted in a hostile work environment for Lucero and in a violation of the Human Rights Act's prohibition of retaliation because of sexual orientation.  Complaint ¶ 71, at 16-17.  As support for his "Negligent Management" claim, Lucero cites an incident in which Vigil "ostracize[d] Lucero" and forced Lucero to apologize to a group of his co-workers.  Complaint ¶ 72,  at 17.

Lucero moves to his fourth claim, which he titles "discriminatory discharge, termination and harassment in violation of the Human Rights Act."  Complaint at 17.  Lucero notes that New Mexico common law recognizes the tort of retaliatory discharge and that the NMHRA recognizes a claim for discharge in violation of public policy.  See Complaint ¶¶ 78-79, at 18.  He alleges that the "Defendant" discharged Lucero, because of Lucero's sexual orientation, and that the "Defendant consistently harassed" Lucero, because of his sexual orientation.  Complaint ¶ 80, at 18.  He adds that the "Defendants have a history of condoning workplace sexual harassment" and that other employees have filed complaints against the "Defendants" for workplace harassment.

---

[3]Lucero does not specify a Department of Labor or cite to a Department of Labor decision. See Complaint ¶ 66, at 16.

Complaint ¶ 84, at 19.  Without specifying the conduct, Lucero argues that the conduct "alleged in this Complaint" is "sufficiently pervasive to alter the terms and conditions of employment and the work environment" to be a hostile work environment.  Complaint ¶ 86, at 19.  He notes that the supervisors engaging in such conduct "were acting at all times relevant to this complaint within the scope and course of their employment," thus rendering Cooperative strictly liable for the supervisors' conduct.  Complaint ¶ 87, at 19.  He alleges another NMHRA violation -- that "Defendants" engaged in retaliation by terminating Lucero a few days after his FMLA leave request, contravening the NMHRA's protection of Lucero's "serious medical condition." Complaint ¶ 90 at 19.

Lucero turns to his fifth claim, which he titles "retaliatory discharge: contrary to clear public policy."  Complaint at 20.  In this claim, he alleges that a termination of an employee in retaliation for "resisting employer violations of laws that secure important public policies contravenes these policies," gives rise to "a common law action in tort."  Complaint ¶ 93, at 20. He argues that "the Defendants[']" termination of Lucero within a few days of requesting FMLA leave and for retaining legal counsel "is contrary to public policy."  Complaint ¶ 94, at 20.  He does not elaborate further on these facts.  See Complaint at 20.

Lucero next moves to his sixth claim, which he titles "defendants engaged in intentional infliction of emotional distress."  Complaint at 21.  He notes that New Mexico recognizes this tort, and he defines the tort according to New Mexico law.  See Complaint ¶ 100, at 21.  He does not allege, however, any specific facts to support this tort claim.  See Complaint at 21-22.  He concludes his Complaint by asking the Court for attorneys' fees and for a jury trial. See Complaint ¶¶ 106-07, at 22-23.

1.      <u>**Motion to Dismiss.**</u>

Martinez and Salazar first address Count III, arguing that the LMRA's § 301 preempts the prima facia tort.  <u>See</u> MTD at 7.  They further note that, although the tort requires that the accused have committed a lawful activity resulting in harm, Lucero alleges that defendants engaged only in unlawful conduct.  See MTD at 7-8 (citing Complaint ¶ 35, at 37-38; <u>Border Area Mental Health, Inc. v. United Behavioral Health, Inc</u>. 331 F. Supp. 3d 1308, 1318-19 (D.N.M. 2018)(Vázquez, J.)).  Martinez and Salazar thus argue that Lucero has not alleged a prima facie tort claim and that the Court should dismiss Count III.  <u>See</u> MTD at 8.

Martinez and Salazar next address Count IV, which they state "may be the most difficult to assess," but characterize as an NMHRA claim.  MTD at 8.  They note that, under the NMHRA, a lawsuit is permitted "'against any person acting for an employer,'" MTD at 8 (quoting N.M. Stat. Ann. § 28-1-2), but that Lucero has not made any allegations that Martinez and Salazar's actions were acting on their employer's behalf, <u>see</u> MTD at 8.  Martinez and Salazar further allege that Lucero needed to file a charge with "the Division" within 180 days of the violation, but Lucero filed a charge a full year after the only incident involving Martinez and Salazar.  MTD at 8-9 (citing N.M. Stat. Ann. § 28-1-10(A); <u>Mitchell-Carr v. McLendon</u>, 1999-NMSC-025, ¶ 10, 980 P.2d 65).  They further note that Lucero omitted the October, 2018, allegation from its Complaint and that it cannot add the allegations now, because more than ninety days have passed since the Order of Non-Determination's issue.  <u>See</u> MTD at 9.  They elaborate on the October, 2018, event, which they argue was a hazing of "all the apprentices," MTD at 9 (citing Charge of Discrimination, filed April 13, 2020 (Doc. 4-1)), which they allege contravenes the claim that Lucero's hazing was based on his sexual orientation, <u>see</u> MTD at 9.  Thus, Martinez and Salazar conclude, Lucero has

not alleged a hostile work environment claim or a NMHRA claim against Martinez and Salazar. <u>See</u> MTD at 10.

Martinez and Salazar next address Count V, which they note is "premised entirely" on Lucero's termination "with which these defendants had no involvement, and thus are presumably not intended to be included as parties thereto."  MTD at 10 (acknowledging that Lucero may have intended Martinez and Salazar to be parties, but stating that it is "hard to tell").  Martinez and Salazar also note that Count V alleges a "'common law action in tort' for retaliatory discharge," MTD at 11 (quoting Complaint ¶ 93), which is available only to at-will employees, <u>see</u> MTD at 11 (citing <u>Silva v. Am. Fed'n of State, Cty. & Mun. Emps.</u>, 2001-NMSC-038, ¶ 1, 37 P.3d 81, 81). Martinez and Salazar argue that, because Lucero was not an at-will employee, the tort is not available to him, and the Court should dismiss the tort.  <u>See</u> MTD at 11.

Martinez and Salazar next turn to Count VI, which they note is written in a manner that makes it difficult to discern against whom Lucero is bringing the claim and out of what conduct the tort arises.  <u>See</u> MTD  at 11.   They argue that, to the extent that the claim is about abusive workplace conduct, LMRA's § 301 preempts the claim.   <u>See</u> MTD at 11.  They further argue that the allegations against Salazar and Martinez do not state a claim, because they do not allege the extreme conduct and resulting emotional distress necessary to state a claim for intentional infliction of emotional distress under New Mexico law.   <u>See</u> MTD at 12 (citing <u>Benavidez v. Sandia Nat'l Labs.</u>, 212 F. Supp. 3d 1039, 1067-79 (D.N.M. 2016)(Browning, J.)).

  **2.** **<u>MTD Response</u>.**

Lucero responds.  <u>See</u> Response to Defendants' Motion to Dismiss, Request for Heairng [sic] on Objections to Removal, and Request for Leave to Amend Complaint if Jurisdiction is Found to Rest Properly with the Federal Court, filed April 26, 2020 (Doc. 15)("MTD Response").

Lucero begins his MTD Response by listing a set of numbered statements.  See MTD Response at 1-5.  One of these statements says that he denies all facts listed in the MTD's Introduction section, except for four facts:  (i) "Salazar and Martinez were not simply co-workers of the Defendant but had supervisory and managerial roles"; (ii) "[t]he date of termination was January 31, 2019, and not January 31, 2018, and reference to the year 2018 was in error"; (iii) "[p]aragraph 35 and 36 are written as state in the Plaintiff's Complaint and refer to the date November 29, 2018; reference to November 29, 2019 is in error";  and (iv) the Complaint's Count IV uses "Defendant" to "allude[] to the Defendant Cooperative in its role as superior in the respondent superior relationship it had to the named Defendants to include Salazar and Martinez."  MTD Response at 2.  He further asserts that Jemez Cooperative is liable for the each of its employees' actions for every Count in the Complaint and that Jemez Cooperative "knew or should have known" of Martinez' and Salazar's alleged harassment of Lucero, but that they instead did not "properly investigate, [] properly correct and properly address any harm" against Lucero.  MTD Response at 4-5.  He further argues that Vigil, who he states was Lucero's direct supervisor, "was notified numerous times of the Plaintiff's concerns regarding Carlos Salazar and Alfonso Martinez's behavior, yet Vigil literally told" Lucero that he was unable to "look at every issue" that Lucero raised.  MTD Response at 5-6.

Lucero then begins his arguments.  He first notes that he has exhausted his administrative remedies with the New Mexico Human Rights Bureau ("NMHRB") and with IBEW.  See MTD Response at 7.  He states that he filed his complaint with NMHRB in a timely manner on October 21, 2019, which resulted in the NMHRB issuing a right to sue letter on December 12, 2019.  See MTD Response at 7.  He elaborates on his NMHRB complaint, noting that he brought his claims under N.M. Stat. Ann §§ 28-1-1 to -15 for discrimination and retaliation based on Lucero's sexual

orientation, and that Jemez Cooperative declined NMHRB's request for meditation.  See MTD
Response at 7.  In terms of exhaustion with the IBEW, Lucero states that, although he went through
the grievance process in the CBA, the IBEW declined to enter arbitration, and thus Lucero could
not pursue any further relief under the CBA.  See MTD Response at 9.

Lucero next addresses Martinez and Salazar's argument that he has failed to state a claim,
arguing only that he "sufficiently pled" each count without elaboration.  MTD Response at 10.  He
then moves to whether the LMRA preempts any of the counts.  See MTD Response at 11-12.
Citing Benavidez v. Sandia National Laboratories, 212 F. Supp. 3d at 1039, Lucero argues that his
Complaint's Counts

> can prevail without the CBA controlling the required elements contained in each of
> the six counts as the terms of the CBA do not establish the rights of each of the
> causes of action and even if consulted, the CBA would not need to be interpreted
> to give the rights outlined in Count 1 through 6 of the Complaint.

MTD Response at 12.  He argues that his "tortious claims" do not require assessment of the CBA,
because they raise duties independent from the CBA.  MTD Response at 12.

Noting that the LMRA's § 301 does not preempt "every dispute concerning employment,
or tangentially involving a provision of law," Lucero summarizes Allis-Chalmers Corp. v. Lueck,
471 U.S. 202 (1985), which Lucero alleges sets the preemption standard: "'[W]hen *resolution of
a state law claim is substantially dependent upon analysis of the terms of an agreement made
between the parties in a labor contract, that claim must either be treated as a § 301 claim or
dismissed as pre-empted by federal labor-contract law.*'"  MTD Response at 13 (quoting Allis-
Chalmers Corp. v. Lueck, 471 U.S. at 220)(internal citation omitted in MTD Response)(emphases
and alteration in MTD Response).  Lucero excerpts another case from the Supreme Court of the

- 16 -

United States, <u>Caterpillar, Inc. v. Williams</u>, 482 U.S. 386 (1987), in which the Supreme Court says that:

> "Section 301 says nothing about the content or validity of individual employment contracts.  It is true that respondents, bargaining unit members at the time of the plant closing, possessed substantial rights under the collective agreement, and could have brought suit under § 301.  As masters of the complaint, however, they chose not to do so."

MTD Response at 14 (quoting <u>Caterpillar, Inc. v. Williams</u>, 482 U.S. at 394-95).  He concludes that Lucero's claims outside the CBA's terms "are sufficiently pleaded to support independent claims that do not f[a]ll under" the LMRA's § 301.  MTD Response at 15 (citing <u>Voilas v. Gen. Motors Corp.</u>, 170 F.3d 367, 373-74 (3d Cir. 1999)).

Lucero then reiterates that the Complaint's Counts 1-6 "are not inextricably intertwined with the CBA and are instead, independent of the CBA for Section 301 purposes."  MTD Response at 15.  To support his contention that Count V is an independent count that § 301 does not preempt, Lucero cites <u>Lingle v. Norge Division of Magic Chef, Inc.</u>, 468 U.S 399 (1988).  <u>See</u> MTD Response at 15.  He notes that, in that case, the Supreme Court concluded that the elements of a state retaliatory discharge claim did not require the district court to look at the CBA, and thus the state claim was independent for § 301's purposes.  <u>See</u> MTD Response at 15-16 (noting that the Supreme Court concluded that the same factual considerations did not render the state-law analysis dependent on the contractual analysis).  Lucero cites a case from the United States Court of Appeals for the Tenth Circuit, <u>Mowry v. United Parcel Service</u>, 415 F.3d 1149, 1153 (10th Cir. 2005), in which the Tenth Circuit concluded that "resolution of the plaintiff's retaliatory discharge claim [did not involve] interpretation of the CBA," even though the CBA "expressly incorporated the statutory provisions upon which the plaintiff relied."  MTD Response at 16-17 (citing <u>Mowry v. United Parcel Serv.</u>, 415 F.3d at 1153).  Despite concluding that "federal law did not preempt

the plaintiff's state law retaliation claim solely because the CBA incorporated the safety regulations upon which he based his claim," the Tenth Circuit concluded that the LMRA's § 301 preempted the plaintiff's second claim -- that the defendant underpaid the plaintiff and terminated the plaintiff when the plaintiff complained about being underpaid -- and the third claim -- that the plaintiff's termination was intentional infliction of emotional distress.  MTD Response at 17-18. According to Lucero, to resolve both claims, the Tenth Circuit needed to examine the CBA.  See MTD Response at 18.

Lucero also cites another Tenth Circuit case relating to preemption in a breach-of-contract case.  See MTD Response at 18 (citing Garley v. Sandia Corp, 236 F.3d 1200 (10th Cir. 2001)). In this case, the Tenth Circuit affirmed the district court's decision that the LMRA's § 301 preempts the breach-of-contract claim, because the claim "revolved around the manner in which the defendant conducted its investigation of suspected employee misconduct and the way in which the plaintiff was terminated."  MTD Response at 19 (citing Garley v. Sandia Corp, 236 F.3d at 1206)).  Lucero states that this analysis is inapplicable in the present case, because, in Lucero's case, "an implied contract claim operates to work to determine implied covenants not expressly found in the IBEW's CBA," and Lucero "did not plead a cause of action for breach of implied contract."  MTD Response at 18-19.

Lucero then cites another Tenth Circuit case, in which a plaintiff brought an implied-contract claim based on the defendant's business ethics standards.  See MTD Response at 20 (citing Cumpston v. Dyncorp Tech. Serv., Inc., 76 F. App'x 861 (10th Cir. 2003)(unpublished)).  Lucero explains that, in that case, the plaintiff argued that, because the business ethics standards forbade harassment, the defendant breached its duty arising from its standards by permitting harassment. See MTD Response at 20 (citing Cumpston v. Dyncorp Tech. Serv., Inc., 76 F. App'x at 863).

The Tenth Circuit concluded that, regardless whether the defendant's business ethics standards were meant to be read along with the CBA, it would still need to consider the CBA to resolve the implied-contract claim, because the business ethics standards defined "harassment" only vaguely. MTD Response at 20 (citing Cumpston v. Dyncorp Tech. Serv., Inc., 76 App'x at 864).

Lucero finally the Court's case, Perez v. Qwest Corp., 883 F. Supp. 2d 1095 (D.N.M. 2012)(Browning, J.), in which, according to Lucero, the "plaintiff alleged that the CBA preempted his assault and battery claim." MTD Response at 21-22 (citing Perez v. Qwest Corp., 883 F. Supp. 2d at 1125-26). The Court concluded that it did not need to consult the CBA to resolve the claim, because (i) "the CBA did not contain a provision addressing physical alterations between employees"; and (ii) it was unnecessary for the Court to look at the CBA's provisions related to injured and ill employees. MTD Response at 22 (citing Perez v. Qwest Corp., 883 F. Supp. 2d at 1125-26). Thus, according to Lucero, the Court concluded that the LMRA's § 301 did not preempt the plaintiff's claim. See MTD Response at 22 (citing Perez v. Qwest Corp., 883 F. Supp. 2d at 1126).

Before moving to the prima facie tort claim, Lucero notes that the Supreme Court has stated that "'the mere need to look to the collective-bargaining agreement for damages computation is no reason to hold the state-law claim defeated by § 301.'" MTD Response at 21-22 (quoting Livadas v. Bradshaw, 512 U.S. 107, 125 (1994)). Lucero then argues that he has "more than adequate facts" to demonstrate that Jemez Cooperative acted with the intent to make Lucero Jemez Cooperative's "scapegoat for all action to permit an alleged case of misconduct by Plaintiff." MTD Response at 23. He further argues that Jemez Cooperative intended to injure Lucero by investigating allegations of misconduct "with no intent to actually review the issues that arose from those complaints." MTD Response at 23.

- 19 -

Lucero concludes by asking to amend his Complaint under rule 15 of the Federal Rules of Civil Procedure.  See MTD Response at 23.  He asks to amend his Complaint "to address any ambiguity" that Martinez and Salazar raised, to add a tortious-interference-of-contract claim, and to correct Defendant Donna Trujillo's name in the case caption.  See MTD Response at 24.  He promises that he will file a separate motion with these requests.  See  MTD Response at 24.

### 3.      **MTD Reply.**

Martinez and Salazar reply.  See Defendants Martinez' and Salazar's Reply Memorandum for their Motion to Dismiss Counts III Through VI at 1, filed May 8, 2020 (Doc. 18)("MTD Reply").  They first address Lucero's preemption argument, countering his reliance on the Caterpillar, Inc. v. Williams holding that, as long as resolution of a state-law claim does to require a court to look at the CBA, the LMRA's § 301 does not preempt the state-la claim.  See MTD Reply at 5.  They then differentiate the facts in Caterpillar, Inc. v. Williams, from the present case, noting that the defendant in Caterpillar, Inc. v. Williams breached individual contracts, "which did not implicate the CBA at all."  MTD Reply at 5.  In contrast, Martinez and Salazar allege, Lucero "directly implicate[s]" the CBA, because he filed a grievance with the IBEW alleging a breach of the CBA.  MTD Reply at 6.  Thus, Lucero's preemption argument "addresses issue[s] that are not even raised herein and fails to address the arguments that are raised in the" MTD.  MTD Reply at 6.

Martinez and Salazar move to Count III -- prima facie tort -- which Martinez and Salazar argued the Court should dismiss in their MTD, because Lucero does not allege that Martinez and Salazar committed a lawful act resulting in harm to Lucero.  See MTD Reply at 6.  They note that, in the MTD Response, Lucero "claims the lawful conduct was hiring, supervising and retaining employees 'who abused the Plaintiff.'"  MTD Reply at 6  (quoting MTD Response at 7).  Martinez

and Salazar counter this argument by noting that it would be unlawful conduct for an employer to maintain employees who abuse other employees and that neither the CBA nor the Complaint support the idea that Martinez or Salazar had the authority to hire, supervise, or fire other employees.  See MTD Reply at 6.

Martinez and Salazar next address Count IV -- the NMHRA claim -- which they state is based on an October, 2018, incident involving Martinez and Salazar, because the other acts involve the hiring and firing of employees.  See MTD Reply at 7.  Martinez and Salazar note that Lucero has not responded to their contention that the substance of Lucero's argument did not constitute a NMHRA violation but that Lucero concedes that he is alleging Count IV against only Jemez Cooperative.  See MTD Reply at 7 (citing MTD Response at 2).  Thus, Martinez and Salazar state that dismissal of this claim against Martinez and Salazar "is clearly mandated."  MTD Reply at 7.

Martinez and Salazar next address Count V -- retaliatory discharge -- which they reiterate is not available to Lucero, because he was not an at-will employee.  See MTD Response at 8.  They contravene Lucero's reliance on caselaw, stating that Lucero has misinterpreted Christopherson v. Poutsch, Passell, Cleveland, and the Rio Rancho Public Schools Board of Education, 2015 WL 13662707, and Weise v. Washington Tru Sols. LLC 2008-NMCA-121, ¶ 26, 192 P.3d 1244, which is about a statutory claim under New Mexico's Whistleblower Protection Act, N.M. Stat. Ann. §§ 10-16-C-1 to -6, and not a common-law claim of retaliatory discharge.  See MTD Reply at 8.  They reiterate again that Martinez and Salazar did not participate in Lucero's termination, and that the Court should dismiss Count V against them.  See MTD Reply at 9.

Martinez and Salazar conclude by addressing Count VI -- intentional inflection of emotional distress -- which they argue does not state allegations sufficient to state an intentional inflication of emotional distress claim.  See MTD Reply at 9.  They then note that Lucero "readily

admitted" that the Tenth Circuit has concluded that "such claims are preempted." MTD Reply at 9

(citing MTD Response at 18; <u>Mowry v. United Parcel Serv</u>., 415 F.3d at 1157). Thus, Martinez

and Salazar ask the Court to dismiss Count VI against them. <u>See</u> MTD Reply at 9.

1.      **Motion for Default.**

Martinez and Salazar filed the Motion for Default. <u>See</u> Motion for Default at 1. In the

Motion for Default, they ask the Court to enter default judgement against Lucero. <u>See</u> Motion for

Default at 1. They note the presumption in favor of the defaulting defendant. <u>See</u> Motion for

Default at 2 (citing <u>Dyer v. Pacheco</u>, 1982-NMCA-148, 651 P.2d 1314, 1317)). They then state

that they filed their Counterclaim on February 21, 2020, and that Lucero did not respond within

thirty days of service. <u>See</u> Motion for Default at 2. Thus, they argue, the Court should enter

default judgement in their favor against Lucero. <u>See</u> Motion for Default at 2.

2.      **Motion for Default Response.**

Lucero responds to the Motion for Default. <u>See</u> Plaintiff's Response to Plaintiff Salazar's

Motion for Default Judgement at 1, filed April 22, 2020 (Doc. 10)("Motion for Default

Response"). Lucero "denies the allegation" in the Motion for Default and states that, because

Lucero's attorney Marlo Aragon was not sent or served with the Martinez and Salazar Complaint,

"service was incomplete." Motion for Default Response at 1-2. Lucero highlights N.M. R. Ann.

1-006(B), which states that a court may "extend the time on motion made after the time has expired

if the party failed to act because of excusable neglect." Motion for Default at 2. Lucero states

that, if he must, he will file a motion pursuant to rule 1-006(B)(b), and he will move to extend his

response time to the Martinez and Salazar Counterclaim. <u>See</u> Motion for Default Response at 2.

He then argues that his Motion for Default is timely filed if it was filed on or before April 13,

2020. <u>See</u> Motion for Default Response at 2-3. Finally, he reserves the right to add affirmative

defenses and raises several other affirmative defenses: (i) "possible lack of jurisdiction over the subject matter as Defendant Salazar has moved to remove this case to Federal Court"; (ii) "if removed to Federal Court as requested by Defendant Salazar, lack of jurisdiction over the person"; (iii) "improper venue for the foregoing reasons"; (iv) "insufficiency of service of process of Respondent Salazar's Counterclaim as stated above"; and (v) "failure to state a claim upon which relief can be granted."  Motion for Default Response at 3.

### 3.   <u>Motion for Default Reply</u>.

Salazar replies to the Motion for Default Response.  <u>See</u> Counter-Plaintiff Salazar's Reply to Petitioner's Response to Defendant Salazar's Motion for Default Judgment, filed April 21, 2020 (Doc. 6)("Motion for Default Reply").  After reiterating the facts, <u>see</u> Motion for Default Reply at 1-2, Salazar begins his arguments, <u>see</u> Motion for Default Reply at 2.  Salazar first counters Lucero's argument that service was improper, because Salazar did not serve one of Lucero's attorneys, Ms. Aragon, with a copy of the Answer and Counterclaim.  <u>See</u> Motion for Default Reply at 2 (citing Motion for Default Response ¶ 3, at 1-2).  Salazar argues that, on February 21, 2020, he served Aragon with the Answers and Counterclaim.  <u>See</u> February 21, 2020 Email from Sam Garcia to LaSella Walthall & Betsy Salcedo, filed April 21, 2020 (Doc. 6-4)(carbon-copying the email to Marlo Aragon and Jonlyn Martinez).  Salazar notes that he is not required to serve filings through the Secured Odyssey Public Access system, nor is he required to serve a file-stamped document.  <u>See</u> Motion for Default Reply at 2.  He further notes that any individual with access to the Secured Odyssey Public Access system also has access to all unsealed documents on the system.  <u>See</u> Motion for Default Reply at 3.

Salazar then points out that, although Lucero pleads excusable neglect for not responding to the Counterclaim, Lucero does not specify what the excusable neglect is.  <u>See</u> Motion for Default

Reply at 3.  Salazar states that, according to N.M. R. Ann. 1-055(A) and rule 55 of the Federal Rules of Civil Procedure, the Court must enter default judgment in Salazar's favor, because of Lucero's non-response.  See Motion for Default Reply at 3-4.  Acknowledging "that default judgment is a harsh remedy," Salazar nevertheless states that default judgment is appropriate, because Lucero has not given justification for the delay, has made "false allegations concerning service," and has not cited any authority to support his arguments.  Motion for Default Reply at 4. He next argues that the Court should discard Lucero's argument that the Second Judicial District Court's closure justified delay, because the case was pending only in the First Judicial Court, which renders the Second Judicial Court's closure immaterial.  See Motion for Default Reply at 4-5. Salazar concludes by noting that none of Lucero's alleged affirmative defenses "establish a meritorious defense in this matter."  Motion for Default Reply at 5.

### 4.    June 25 Hearing.

The Court held a hearing on the MTD on June 25, 2020.  See Draft Transcript of Hearing at 1 (taken June 25, 2020)("June 25 Tr.").[4]  The Court began by asking whether Lucero should submit just the prima facie tort theory or submit alternative theories including that the defendant engaged in unlawful conduct.  See June 25 Tr. at 6:16-21 (Court).  Lucero responded that, in the past, New Mexico courts have encouraged pleading alternative theories if appropriate.  See June 25 Tr. at 7:10-14 (Court).  Lucero then stated that he pled alternative theories for two reasons: (i) to "cover [his] base[s]"; and (ii) to "be able to move forward on discovery without being told that [it] would just be frivolous discovery."  Tr. 9:13-17 (Salcedo).  Martinez and Salazar then

---

[4]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

reiterated their main arguments from their MTD and their MTD Reply.  <u>See</u> June 25 Tr. at 10:8-11:7 (Martinez).  Regarding Martinez and Salazar's argument that Lucero has not alleged sufficient facts to state a claim for relief, the Court asked what Martinez and Salazar would like to see Lucero plead for the prima facie tort claim.  <u>See</u> June 25 Tr. at 11:8-14 (Court).  Martinez and Salazar responded that Lucero needs to allege lawful conduct for a prima facie tort claim.  <u>See</u> June 25 Tr. at 11:15-18 (Court).  Lucero responded that the lawful conduct is that the defendants were violating their "policies in place against workplace violence," and "used their retention and their supervision rules to justify their conduct . . . to harm and to support a termination."  June 25 Tr. at 8-10; 21-22 (Salcedo).  <u>See</u> June 25 Tr. at 12:8-13:2 (Martinez).  Lucero further notes that the difficulty of parsing whether actions are legal or illegal is exacerbated by the case's early stage.  <u>See</u> June 25 Tr. at 14:7-15:10 (Salcedo).

Martinez and Salazar disagreed with Lucero's contention about the difficulty of distinguishing between legal and illegal conduct, noting that Lucero "just simply can't establish the elements of a prima facie tort" with the facts pled in the Complaint.  June 25 Tr. at 15:14-15.  <u>See</u> June 25 Tr. at 15:14-25 (Martinez).  Martinez and Salazar then pressed the preemption issue, repeating their arguments that Martinez and Salazar were not supervisors for the purposes of the LMRA's § 301 and thus cannot be included in Lucero's allegations.  <u>See</u> June 25 Tr. at 16:3-10 (Martinez).  Lucero countered that preemption is inappropriate, because each Count has independent support and none of the counts are alleged to be contract disputes.  <u>See</u> June 25 Tr. at 16:22-18-1 (Salcedo).  Martinez and Salazar responded that Lucero references the CBA, attaches the CBA, and is governed by the CBA, and thus the LMRA's § 301 preempts the claims.  <u>See</u> June 25 Tr. 18:23-19:6 (Martinez).

Martinez and Salazar next moved to Count IV, noting that Lucero mentions the October, 2018, incident only in the complaint Lucero submitted to the NMHRB, and the Complaint filed with the Court does not mention that event.  See June 25 Tr. at 19:16-20:22 (Martinez).  Thus, Martinez and Salazar concluded, Lucero has not exhausted administrative remedies regarding the claim against them, and Lucero cannot exhaust the claim here, because more than 300 days have passed since the October, 2018, event.  See June 25 Tr. at 20:2-9 (Martinez).  Lucero reiterated his arguments from the MTD Response, which are grounded on the fact that he was harassed based on his sexual orientation, and he thus argues that he has a basis for an NMHRA claim.  See June 25 Tr. at 20:14-23:18 (Salcedo).

Lucero, Martinez, and Salazar then repeated their arguments from the briefs about whether retaliatory discharge could apply to Lucero, even though he was not an at-will employee.  See June 25 Tr. at 24:20-31:3 (Martinez, Court, Salcedo).  Lucero mentions that he found a case that recently permitted a retaliatory discharge claim "to proceed even though [the defendant] was not a union employee."  June 25 Tr. at 25-2-3 (Salcedo).  He later argues that Christopherson v. Poutsch, Passell, Cleveland, and the Rio Rancho Public Schools Board of Education, Civ. No. 14-0152 JCH/SCY, 2015 WL 13662707 (D.N.M. April 30, 2015)(Herrera, J.), permits "an employee with a CBA to bring a claim for retaliatory discharge through amended memorandum opinion and order."  June 25 Tr. at 26:21-24 (Salcedo).  See June 25 Tr. at 26:17-24 (Salcedo).  Martinez and Salazar distinguish  this case as arising out of the New Mexico Whistleblower Protection Act, which permits a retaliatory discharge claim.  See June 25 Tr. at 27:24-28:18 (Martinez).  Lucero, Martinez, and Salazar then moved to the final Count, intentional infliction of emotional distress, repeating their arguments from the brief whether the LMRA's § 301 preempts the claim and whether the Complaint states sufficient facts to establish the elements under state law.  See June

25 Tr. at 31:9-33:20 (Martinez, Court, Wiggins, Salcedo).  Lucero began to discuss text messages in the context of the claim, but then he noted that the Complaint does not include references to the text messages.  See June 25 Tr. 33:20-34:11 (Salcedo).  Jemez Cooperative emphasized that "any suggestion that [Martinez and Salazar] were management is contrary to the express provisions of the CBA."  June 25 Tr. at 34:24-35:1 (Wiggins).  Martinez and Salazar agreed, but also noted that, even if they were supervisors, the LMRA's § 301 still preempts the claim.  See June 25  Tr. 36:14-20 (Martinez).  Lucero countered with arguments from the MTD Response, and he noted that the Court should consider Martinez' and Salazar's level of responsibility and that both Martinez and Salazar were required to follow Jemez Cooperative's policies and procedures.  See June 25 Tr. at 38:4-39:5 (Salcedo).  The Court remarked on how detailed the CBA is, and Lucero noted that the CBA's detail likely could resolve disputes about what the CBA says.  See June 25 Tr. at 39:6-41:16 (Court, Wiggins, Salcedo).  Jemez Cooperative disagreed that the CBA's details can resolve disputes about what it says, because "one of the primary issues that we're already looking at substantively is whether [Martinez and Salazar] were considered supervisors or managerial employees not part of the collective bargaining agreement."  June 25 Tr. at 41:24-42:3 (Wiggins). See id. at 41:19-42:3 (Wiggins).

The Court then switched to the Motion for Default.  See June 25 Tr. at 42:18-23 (Court). Martinez and Salazar stated that the briefs "speak for themselves": they filed the Martinez and Salazar Complaint, Lucero did not respond within thirty days, and then Martinez and Salazar filed the Motion for Default.  June 25 Tr. at 42:25 (Martinez).  See id. at 42:24-43:7 (Martinez). The Court asked whether counter-plaintiffs have to seek default from the clerk's office before default judgment, and Martinez and Salazar responded that, although they did not see anything to differentiate plaintiffs from counterplaintiffs, rule 55(b)(2) permits the party to petition the Court

for a default judgment.  See June 25 Tr. at 43:16-23 (Court, Martinez).  The Court explained that it is a two-step process for plaintiffs and that plaintiffs can come to the Court for a default judgment after the Clerk of the Court enters a notice of default.  See June 25 Tr. at 43:24-44:11 (Court).  Lucero emphasized that default judgements are not favored in New Mexico and that there was not a significant delay or any prejudice resulting from their late response.  See June 25 Tr. at 44:17-46:22 (Salcedo, Court)(noting that Lucero's counsel had been in contact with Martinez' and Salazar's counsel regarding a filed copy and that the delay was four days).  Martinez and Salazar noted that, although Lucero's counsel asked for "an endorsed copy of the motion" and wanted an extension of the deadline to respond, Lucero's counsel had not moved for an extension.  June 25 Tr. at 47:14-15 (Martinez).  See id. at 47:5-48:2 (Martinez).

## LAW REGARDING DEFAULT JUDGMENTS AND THE ENTRY OF DEFAULT UNDER RULE 55

Rule 55 of the Federal Rules of Civil Procedure provides a two-step process for a default judgment.  See United States v. Rivera, No. CIV 14-0579 JB/CG, 2015 WL 4042197, at *9-12 (D.N.M. June 30, 2015)(Browning, J.).  First, a party must obtain a Clerk of Court's entry of default.  See Fed. R. Civ. P. 55(a)("When a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default."); Watkins v. Donnelly, 551 F. App'x 953, 958 (10th Cir. 2014)(unpublished)[5]("Entry of default by the clerk is a necessary prerequisite that must be

---

[5]Watkins v. Donnelly is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A) ("Unpublished decisions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored.

performed before a district court is permitted to issue a default judgment.").  Second, the party

must request that the Clerk enter default judgment when the claim is for "a sum certain or a sum

that can be made certain by computation," Fed. R. Civ. P. 55(b)(1), or, "[i]n all other cases, the

party must apply to the court for a default judgment," Fed. R. Civ. P. 55(b)(2).

After entering default judgment, a district court takes all of the well-pleaded facts in a

complaint as true.   See United States v. Craighead, 176 F. App'x 922, 925 (10th Cir.

2006)(unpublished); Flaks v. Koegel, 504 F.2d 702, 707 (2d Cir. 1974)("While a default judgment

constitutes an admission of liability, the quantum of damages remains to be established by proof

unless the amount is liquidated or susceptible of mathematical computation."  (citations omitted)).

"If defendant does not contest the amount prayed for in the complaint [by failing to answer] and

the claim is for a sum certain or a sum that can be made certain by computation, the judgment

generally will be entered for that amount without any further hearing."  United States v. Craighead,

176 F. App'x at 925 (alteration in original)(quoting 10A Wright & Miller, Federal Practice &

Procedure § 2688 (3d ed. 1998)).  See Fed. R. Civ. P. 8(d) ("Averments in a pleading to which a

responsive pleading is required, other than those as to the amount of damage, are admitted when

not denied in the responsive pleading.").  A court may enter a default judgment for a damage award

without a hearing if the amount claimed is "one capable of mathematical calculation."  Applied

_____

      However, if an unpublished opinion or order and judgment has persuasive value
with respect to a material issue in a case and would assist the court in its disposition,
we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005).  The Court concludes that Watkins
v. Donnelly, United States v. Craighead, Nard v. City of Oklahoma, Pinson v. Equifax Credit Info.
Servs., Inc., Hunt v. Ford Motor Co., Amaro v. New Mexico, Douglas v. Norton, and United States
v. $285,350.00 in U.S. Currency have persuasive value with respect to material issues and will
assist the Court in its disposition of this Memorandum Opinion.

Capital, Inc. v. Gibson, 558 F. Supp. 2d 1189, 1202 (D.N.M. 2007)(Browning, J.)(quoting H.B.

Hunt v. Inter-Globe Energy, Inc., 770 F.2d 145, 148 (10th Cir. 1985)(citing Venable v. Haislip,

721 F.2d 297, 300 (10th Cir. 1983)).  "It is a familiar practice and an exercise of judicial power

for a court upon default, by taking evidence when necessary or by computation from facts of

record, to fix the amount which the plaintiff is lawfully entitled to recover and to give judgment

accordingly."  10A Wright & Miller, supra, § 2688 (quoting Pope v. United States, 323 U.S. 1, 12

(1944)).  "If the damages sum is not certain or capable of easy computation, the court may" conduct

such hearings or order such references as it deems necessary.  Applied Capital, Inc. v. Gibson, 558

F. Supp. 2d at 1202[6] (citing Beck v. Atl. Contracting Co., 157 F.R.D. 61, 64 (D. Kan.

1994)(Lungstrum, J.), superseded by statute, Kan. Stat. Ann. 60-308, as recognized in Cessna Fin.

Corp. v. VYWB, LLC, 982 F Supp. 2d 1226, 1233 (D. Kan. 2013)(Crow, J.)).  See Fed. R. Civ. P.

55(b)(2)(B)("The court may conduct hearings or make referrals . . . when, to enter or effectuate

judgment, it needs to . . . determine the amount of damages.").

   "Default judgments are a harsh sanction."  Ruplinger v. Rains, 946 F.2d 731, 732 (10th

Cir. 1991)(per curiam)("In re Rains").  The Court has noted that, "[b]ecause default judgment is a

harsh sanction involving a court's power to enter and enforce judgments regardless of the merits

---

[6]In that case, the Court provided:

   "Entry of default precludes a trial on the merits."  Olcott v. Del. Flood Co., 327
   F.3d 1115, 1119 n.3 (10th Cir. 2003).  Rule 55(b)(2) does not contain an inherent
   jury requirement; rather, it preserves the right to a jury only when statute requires.
   See Olcott v. Del. Flood Co., 327 F.3d at 1124.  At least where the parties have not
   requested a jury prior to entry of default, the "[d]efendants do not have a
   constitutional right to a jury trial following entry of default." . . .  Mitchell v. Bd.
   of Cty Comm'rs of the Cty of Santa Fe, No. 05CV1155, 2007 WL 2219420, at *18-
   23 (D.N.M. May 9, 2007)(Browning, J.).

Applied Capital, Inc. v. Gibson, 558 F. Supp. 2d at 1202.

of a case, courts do not favor such a sanction 'purely as a penalty for delays in filing or other

procedural error.'"   Noland v. City of Albuquerque, No. CIV 08–0056 JB/LFG, 2009 WL

2424591, at *1 (D.N.M. June 18, 2009)(Browning, J.)(quoting In re Rains, 946 F.2d at 733).

> [S]trong policies favor resolution of disputes on their merits: the default judgment
> must normally be viewed as available only when the adversary process has been
> halted because of an essentially unresponsive party.  In that instance, the diligent
> party must be protected lest he be faced with interminable delay and continued
> uncertainty as to his rights.  The default judgment remedy serves as such a
> protection.

In re Rains, 946 F.2d at 732-33 (citations and internal quotation marks omitted).  See Noland v.

City of Albuquerque, 2009 WL 2124591, at *1 (denying motion for default judgment, because the

counsel for the defendant City of Albuquerque "entered an appearance three days after Noland

filed his motion for default judgment," and, thus, the Court could not "reasonably say that the City

of Albuquerque is an essentially unresponsive party, that the adversary process has been halted, or

that Noland faces interminable delay because of the City of Albuquerque's actions").

"The court may set aside an entry of default for good cause, and it may set aside a default

judgment under Rule 60(b)."  Fed. R. Civ. P. 55(c).  "[T]he good cause required by Fed. R. Civ.

P. 55(c) for setting aside entry of default poses a lesser standard for the defaulting party than the

excusable neglect which must be shown for relief from judgment under Fed. R. Civ. P. 60(b)."

Pinson v. Equifax Credit Info. Servs., Inc., 316 F. App'x 744, 750 (10th Cir.

2009)(unpublished)(quoting Dennis Garber & Assocs., Inc. v. Pack-Tech Int'l Corp., 115 F.3d

767, 775 n.6 (10th Cir. 1997)).  See Hunt v. Ford Motor Co., No. 94-3054, 1995 WL 523646, at *3

(10th Cir. 1995)(unpublished).  The distinction between setting aside an entry of default and setting

aside a default judgment "reflects the different consequences of the two events and the different

procedures that bring them about."  10A Wright & Miller, supra, § 2692.

[T]he clerk or the court may enter a default upon the application of the nondefaulting party.  The entry simply is an official recognition of the fact that one party is in default, as, for example, for failure to comply with the rules, to appear as scheduled, or to prosecute the case with due diligence.   The entry is an interlocutory step that is taken under Rule 55(a) in anticipation of a final judgment by default under Rule 55(b).

 In sharp contrast, a final default judgment is not possible against a party in default until the measure of recovery has been ascertained, which typically requires a hearing, in which the defaulting party may participate; in some situations, a jury trial may be made available to determine an issue of damages. Moreover, the entry of a default judgment is a final disposition of the case and an appealable order.

. . .

Additional differences between relief from the entry of a default and from a default judgment appear in the grounds that will support the motion being granted.  Stated generally, the defaulting party is not entitled to relief from a judgment as a matter of right under Rule 60(b). The movant must present a justification supporting the relief motion and must establish his contentions if challenged.  Although whether relief will be granted is a matter within the sounddiscretion of the trial court, the vacation of a default judgment is subject to the explicit provisions of Rule 60(b), which places additional restraints upon the court's discretion.  The motion to set aside a default entry, on the other hand, may be granted for "good cause shown," which gives a court greater freedom in granting relief than is available in the case of default judgments.

10A Wright & Miller, supra, § 2692 (footnotes omitted).

 While there are some differences between setting aside the entry of default and setting aside a default judgment, there are some important similarities, including that courts may consider the same factors: whether the party willfully defaulted, whether setting aside the entry of default or default judgment would prejudice the non-movant, and whether the movant has presented a meritorious defense.  See United States v. $285,350.00 in U.S. Currency, 547 F. App'x 886, 887 (10th Cir. 2013)(unpublished)("Three requirements must be met when setting aside a default judgment under Rule 60(b): '(1) the moving party's culpable conduct did not cause the default; (2) the moving party has a meritorious defense; and (3) the non-moving party will not be

prejudiced by setting aside the judgment.'" (quoting <u>United States v. Timbers Preserve</u>, 999 F.2d

452, 454 (10th Cir. 1993), <u>abrogated on other grounds</u> by <u>Degen v. United States</u>, 517 U.S. 820,

825 (1996))); <u>Pinson v. Equifax Credit Info Servs., Inc.</u>, 316 F. App'x at 750 ("In deciding whether

to set aside an entry of default, courts may consider, among other things, 'whether the default was

willful, whether setting it aside would prejudice the adversary, and whether a meritorious defense

is presented.'" (quoting <u>Dierschke v. O'Cheskey (In re Dierschke</u>, 975 F.2d 181, 183 (5th Cir.

1992)("<u>Dierschke</u>"))).  The Tenth Circuit has, at times, listed two factors rather than three for the

standard in setting aside a default judgment:

> Rule 60(b) of the Federal Rules of Civil Procedure permits relief from a
> final judgment only if the movant can demonstrate justifiable grounds, including
> mistake, inadvertence, surprise or excusable neglect.  In the case of default
> judgments, courts have established the further requirement that a movant
> demonstrate the existence of a meritorious defense.  <u>E.g.</u>, <u>Gomes v. Williams</u>, 420
> F.2d 1364, 1366 (10th Cir. 1970).  A 60(b) motion thus comprehends two distinct
> aspects[:] justification for relief and a meritorious defense.

<u>In re Stone</u>, 588 F.2d 1316, 1319 (10th Cir. 1978).  <u>See</u> <u>Sawyer v. USAA Ins. Co.</u>, 839 F. Supp.

2d 1189, 1230 (D.N.M. 2012)(Browning, J.)(setting aside a default judgment, because, "when a

plaintiff fails to properly serve a defendant, a default judgment is void and should be set aside

under rule 60(b)(4)").  "Although how these factors will be evaluated and weighed lies within the

discretion of the trial court to a considerable degree, . . . federal courts are willing to grant relief

from a default entry more readily and with a lesser showing than they are in the case of a default

judgment."  10A Wright & Miller, <u>supra</u>, § 2692 (footnotes omitted).  "The standard for setting

aside an entry of default under Rule 55(c) is fairly liberal because '[t]he preferred disposition of

any case is upon its merits and not by default judgment.'"  <u>Crutcher v. Coleman</u>, 205 F.R.D. 581,

584 (D. Kan. 2001)(Vratil, J.)(quoting <u>Gomes v. Williams</u>, 420 F.2d 1364, 1366 (10th Cir. 1970)).

<u>See</u> <u>Applied Capital, Inc. v. Gibson</u>, No. Civ 05–98 JB/ACT, 2007 WL 5685131, at *20-23

(D.N.M. Sept. 27, 2007)(Browning, J.)(liberally construing a pro se defendant's motion to dismiss as a motion to set aside the default, but concluding that the pro se defendant did not show good cause for the Court to set aside the entry of default, because, although setting aside the entry of default would not prejudice the plaintiff, the pro se defendant was "fully aware of the need to answer within the given time limitation and chose not to respond timely," and he failed to appear at a hearing to support his allegation that he had a meritorious defense).  See also Dogs Deserve Better, Inc. v. N.M. Dogs Deserve Better, Inc., No. Civ 05-98 JB/ACT, 2016 WL 6396392, at *22 (D.N.M. Oct. 12, 2016)(Browning, J.)("The standard for setting aside an entry of default under rule 55(c) is liberal, allowing the Court to consider, among other things, whether the default was willful and culpable, whether setting it aside would prejudice the adversary, and whether a meritorious defense is presented.").

## LAW REGARDING MOTIONS TO DISMISS UNDER 12(b)(6) OF THE FEDERAL RULES OF CIVIL PROCEDURE

Rule 12(b)(6) authorizes a court to dismiss a complaint for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  "The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true."  Mobley v. McCormick, 40 F.3d 337, 340 (10th Cir. 1994)(citing Williams v. Meese, 926 F.2d 994, 997 (10th Cir. 1991)).  The complaint's sufficiency is a question of law, and, when considering a rule 12(b)(6) motion, a court must accept as true all well-pled factual allegations in the complaint, view those allegations in the light most favorable to the nonmoving party, and draw all reasonable inferences in the plaintiff's favor.  See Smith v. United States, 561 F.3d 1090, 1098 (10th Cir. 2009)("[F]or purposes of resolving a Rule 12(b)(6) motion, we accept

as true all well-pled factual allegations in a complaint and view these allegations in the light most favorable to the plaintiff." (citing Moore v. Guthrie, 438 F.3d 1036, 1039 (10th Cir. 2006))).

A complaint need not set forth detailed factual allegations, yet a "pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action" is insufficient. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)(citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Ashcroft v. Iqbal, 556 U.S. at 678. "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Bell Atl. Corp. v. Twombly, 550 U.S. at 555. "'At the motion-to-dismiss stage, the court does not weigh the evidence, and "is interested only in whether it has jurisdiction and whether the [p]laintiffs plead a claim to relief that is plausible on its face.'" Rivero v. Bd. of Regents of Univ. of New Mexico, No. CIV 16-0318 JB\SCY, 2019 WL 1085179, at *47 (D.N.M. March 7, 2019)(Browning, J.)(quoting Begay v. Pub. Serv. Co. of N.M., 710 F. Supp. 2d 1161, 1199 (D.N.M. 2010)(Browning, J.)).

To survive a motion to dismiss, a plaintiff's complaint must contain sufficient facts that, if assumed to be true, state a claim to relief that is plausible on its face. See Bell Atl. Corp. v. Twombly, 550 U.S. at 570; Mink v. Knox, 613 F.3d 995, 1000 (10th Cir. 2010). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. at 678 (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 556). This standard requires "'more than a sheer possibility that a defendant has acted unlawfully.'" Nowell v. Medtronic Inc., 372 F. Supp. 3d 1166, 1245 (D.N.M. 2019)(Browning, J.)(quoting Ashcroft v. Iqbal, 556 U.S. at 678). "Thus, the mere metaphysical possibility that some plaintiff could prove some set of facts in support of

the pleaded claims is insufficient; the complainant must give the court reason to believe that this

plaintiff has a reasonable likelihood of mustering factual support for these claims." Ridge at Red

Hawk, LLC v. Schneider, 493 F.3d 1174, 1177 (10th Cir. 2007)(emphasis omitted).  "A court will

not construe a plaintiff's pleadings 'so liberally that it becomes his advocate.'"  Rivero v. Bd. of

Regents of Univ. of New Mexico, 2019 WL 1085179, at *48 (quoting Bragg v. Chavez, No. CIV

07-0343 JB/WDS, 2007 WL 5232464, at *25 (D.N.M. Aug. 2, 2007)(Browning, J.)).  The Tenth

Circuit has stated:

> "[P]lausibility" in this context must refer to the scope of the allegations in a
> complaint: if they are so general that they encompass a wide swath of conduct,
> much of it innocent, then the plaintiffs "have not nudged their claims across the line
> from conceivable to plausible." The allegations must be enough that, if assumed to
> be true, the plaintiff plausibly (not just speculatively) has a claim for relief.

Robbins v. Oklahoma, 519 F.3d 1242, 1247 (10th Cir. 2008)(citations omitted)(quoting Bell Atl.

Corp. v. Twombly, 550 U.S. at 570).  See Gallegos v. Bernalillo Cty. Bd. of Cty. Comm'rs, 278 F.

Supp. 3d 1245, 1259 (D.N.M. 2017)(Browning, J.).

     "When a party presents matters outside of the pleadings for consideration, as a general rule

'the court must either exclude the material or treat the motion as one for summary judgment.'"

Brokers' Choice of Am., Inc. v. NBC Universal, Inc., 861 F.3d 1081, 1103 (10th Cir.

2017)(quoting Alexander v. Okla., 382 F.3d 1206, 1214 (10th Cir. 2004)).  There are three limited

exceptions to this general principle: (i) documents that the complaint incorporates by reference,

see Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. at 322; (ii) "documents referred to in

the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the

documents' authenticity," Jacobsen v. Deseret Book Co., 287 F.3d 936, 941 (10th Cir. 2002); and

(iii) "matters of which a court may take judicial notice," Tellabs, Inc. v. Makor Issues & Rights,

Ltd., 551 U.S. at 322.  See Brokers' Choice of Am., Inc. v. NBC Universal, Inc., 861 F.3d at 1103-

04 (holding that the district court did not err by reviewing a seminar recording and a television episode on a rule 12(b)(6) motion, which were "attached to or referenced in the amended complaint," central to the plaintiff's claim, and "undisputed as to their accuracy and authenticity"). "[T]he court is permitted to take judicial notice of its own files and records, as well as facts which are a matter of public record." Van Woudenberg v. Gibson, 211 F.3d 560, 568 (10th Cir. 2000), abrogated on other grounds by McGregor v. Gibson, 248 F.3d 946, 955 (10th Cir. 2001).

In Gee v. Pacheco, 627 F.3d 1178 (10th Cir. 2010), the defendants "supported their motion with numerous documents, and the district court cited portions of those motions in granting the motion." 627 F.3d at 1186. The Tenth Circuit held that "[s]uch reliance was improper" and that, even if "the district court did not err initially in reviewing the materials, the court improperly relied on them to refute Mr. Gee's factual assertions and effectively convert the motion to one for summary judgment." 627 F.3d at 1186-87. In other cases, the Tenth Circuit has emphasized that, "[b]ecause the district court considered facts outside of the complaint . . . it is clear that the district court dismissed the claim under Rule 56(c) and not Rule 12(b)(6)." Nard v. City of Okla. City, 153 F. App'x 529, 534 n.4 (10th Cir. 2005)(unpublished). In Douglas v. Norton, 167 F. App'x 698 (10th Cir. 2006)(unpublished), the Tenth Circuit addressed an untimely filed charge with the Equal Employment Opportunity Commission -- which missed deadline the Tenth Circuit analogized to a statute of limitations -- and concluded that, because the requirement is not jurisdictional, the district court should have analyzed the question under rule 12(b)(6), and "because the district court considered evidentiary materials outside of Douglas' complaint, it should have treated Norton's motion as a motion for summary judgment." Douglas v. Norton, 167 F. App'x at 704-05.

The Court has previously ruled that, when a plaintiff references and summarizes defendants' statements in a complaint, the Court cannot rely on documents containing those statements that the defendants attach in their briefing.  See Mocek v. City of Albuquerque, No. CIV 11-1009 JB/KBM, 2013 WL 312881, at *50-51 (D.N.M. Jan. 14, 2013)(Browning, J.).  The Court reasoned that the complaint did not incorporate the documents by reference, nor were the documents central to the plaintiff's allegations in the complaint, because the plaintiff cited the statements only to attack the defendant's reliability and truthfulness.  See 2013 WL 312881, at *50-51.  The Court has also previously ruled that, when determining whether to toll a statute of limitations in an action alleging fraud and seeking subrogation from a defendant, the Court may not use interviews and letters attached to a motion to dismiss, which show that a plaintiff was aware of the defendant's alleged fraud before the statutory period expired.  See Great Am. Co. v. Crabtree, No. CIV 11-1129 JB/KBM, 2012 WL 3656500, at *3, *22-23 (D.N.M. Aug. 23, 2012)(Browning, J.)("Crabtree").  The Court in Crabtree determined that the documents did not fall within any of the Tenth Circuit's exceptions to the general rule that a complaint must rest on the sufficiency of its contents alone, as the complaint did not incorporate the documents by reference or refer to the documents.  See 2012 WL 3656500, at *22-23.

On the other hand, in a securities class action, the Court has ruled that a defendant's operating certification, to which plaintiffs refer in their complaint, and which was central to whether the plaintiffs adequately alleged a loss, falls within an exception to the general rule, so the Court may consider the operating certification when ruling on the defendant's motion to dismiss without converting the motion into one for summary judgment.  See Genesee Cty. Emps.' Ret. Sys. v. Thornburg Mortg. Secs. Tr. 2006-3, 825 F. Supp. 2d 1082, 1150-51 (D.N.M. 2011)(Browning, J.).  See, e.g., S.E.C. v. Goldstone, 952 F. Supp. 2d 1060, 1217-18 (D.N.M.

2013)(Browning, J.)(considering, on a motion to dismiss, electronic mail transmissions referenced in the complaint as "documents referred to in the complaint," which are "central to the plaintiff's claim" and whose authenticity the plaintiff did not challenge); Mata v. Anderson, 760 F. Supp. 2d 1068, 1101 (D.N.M. 2009)(Browning, J.)(relying on documents outside of the complaint because they were "documents that a court can appropriately view as either part of the public record, or as documents upon which the Complaint relies, and the authenticity of which is not in dispute").

## LAW REGARDING MOTIONS TO AMEND

"While Rule 15 governs amendments to pleadings generally, rule 16 of the Federal Rules of Civil Procedure governs amendments to scheduling orders." Bylin v. Billings, 568 F.3d 1224, 1231 (10th Cir. 2009)(citing Fed. R. Civ. P. 16(b)). When a court has not entered a scheduling order in a particular case, rule 15 governs amendments to a plaintiff's complaint. See Fed. R. Civ. P. 15. When a scheduling order governs the case's pace, however, amending the complaint after the deadline for such amendments implicitly requires an amendment to the scheduling order, and rule 16(b)(4) governs changes to the scheduling order. See Bylin v. Billings, 568 F.3d at 1231.

Rule 15(a) of the Federal Rules of Civil Procedure provides:

> **(1)** **Amending as a Matter of Course.** A party may amend its pleading once as a matter of course within:
>
> > **(A)** 21 days after serving it, or
> >
> > **(B)** if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under rule 12(b), (e), or (f), whichever is earlier.
>
> **(2)** **Other Amendments.** In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave. The

court should freely give leave when justice so requires.

Fed. R. Civ. P. 15(a). Further, the local rules provide that, with respect to motions to amend a pleading, "[a] proposed amendment to a pleading must accompany the motion to amend." D.N.M.LR-Civ. 15.1.

Under rule 15(a), the court should freely grant leave to amend a pleading where justice so requires. See In re Thornburg Mortg., Inc. Sec. Litig., 265 F.R.D. 571, 579-80 (D.N.M. 2010)(Browning, J.); Youell v. Russell, No. CIV 04-1396 JB/WDS, 2007 WL 709041, at *1-2 (D.N.M. 2007)(Browning, J.); Burleson v. ENMR-Plateau Tele. Coop., No. CIV 05-0073 JB/KBM, 2005 WL 3664299, at *1-2 (D.N.M. Sept. 23, 2005)(Browning, J.). The Supreme Court has stated that, in the absence of an apparent reason such as "undue delay, bad faith or dilatory motive . . . [,] repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.," leave to amend should be freely given. Fomen v. Davis, 371 U.S. 178, 182 (1962). See Curley v. Perry, 246 F.3d 1278, 1284 (10th Cir. 2001); In re Thornburg Mortg., Inc. Sec. Litig., 265 F.R.D. at 579-80.

A court should deny leave to amend under rule 15(a) where the proposed "amendment would be futile." Jefferson Cty. Sch. Dist. v. Moody's Investor's Serv., 175 F.3d 848, 859 (10th Cir. 1999). See In re Thornburg Mortg., Inc. Sec. Litig., 265 F.R.D. at 579-80. An amendment is "futile" if the pleading "as amended, would be subject to dismissal." In re Thornburg Mortg., Inc. Sec. Litig., 265 F.R.D. at 579-80 (citing TV Commc'ns Network, Inc. v. Turner Network Television, Inc., 964 F.2d 1022, 1028 (10th Cir. 1992)). A court may also deny leave to amend "upon a showing of undue delay, undue prejudice to the opposing party, bad faith or dilatory motive, [or] failure to cure deficiencies by amendments previously allowed." In re Thornburg

Mortg., Inc. Sec. Litig., 265 F.R.D. at 579 (quoting Frank v. U.S. W., Inc., 3 F.3d 1357, 1365-66

(10th Cir. 1993)).  See Youell v. Russell, 2007 WL 709041, at *2-3 (D.N.M. 2007)(Browning, J.);

Lymon v. Aramark Corp., No. CIV 08-0386 JB/DJS, 2009 WL 1299842 (D.N.M.

2009)(Browning, J.).  The Tenth Circuit has also noted:

> It is well settled in this circuit that untimeliness alone is a sufficient reason to deny
> leave to amend, see Woolsey v. Marion Laboratories, Inc., 934 F.2d 1452, 1462
> (10th Cir. 1991); Las Vegas Ice & Cold Storage Co. v. Far West Bank, 893 F.2d
> 1182, 1185 (10th Cir. 1990); First City Bank v. Air Capitol Aircraft Sales, 820 F.2d
> 1127, 1133 (10th Cir. 1987), especially when the party filing the motion has no
> adequate explanation for the delay, Woolsey, 934 F.2d at 1462.  Furthermore,
> "[w]here the party seeking amendment knows or should have known of the facts
> upon which the proposed amendment is based but fails to include them in the
> original complaint, the motion to amend is subject to denial."  Las Vegas Ice, 893
> F.2d at 1185.

Frank v. U.S. W., Inc., 3 F.3d at 1365-66.[7]  The longer the delay, "the more likely the motion to

amend will be denied, as protracted delay, with its attendant burdens on the opponent and the court,

is itself a sufficient reason for the court to withhold permission to amend."  Minter v. Prime Equip.

Co., 451 F.3d at 1205 (citing Steir v. Girl Scouts of the USA, 383 F.3d 7, 12 (1st Cir. 2004)).

Undue delay occurs where the plaintiff's amendments "make the complaint 'a moving target.'"

Minter v. Prime Equip. Co., 451 F.3d at 1206 (quoting Viernow v. Euripides Dev. Corp., 157 F.3d

785, 799-800 (10th Cir. 1998)).  "[P]rejudice to the opposing party need not also be shown."  Las

Vegas Ice & Cold Storage Co. v. Far W. Bank, 893 F.2d at 1185.  "Where the party seeking

amendment knows or should have known of the facts upon which the proposed amendment is

---

[7]The Court notes that there is older authority in the Tenth Circuit that seems to be to the
contrary.  See R.E.B., Inc. v. Ralston Purina Co., 525 F.2d 749, 751 (10th Cir. 1975)("Lateness
does not of itself justify the denial of the amendment.").  Minter v. Prime Equipment Co. seems to
clarify that the distinction is between "delay" and "undue delay."  Minter v. Prime Equipment Co.,
451 F.3d at 1205-06.  Delay is undue "when the party filing the motion has no adequate explanation
for the delay."  Minter v. Prime Equipment Co., 451 F.3d at 1206.

based but fails to include them in the original complaint, the motion to amend is subject to denial." Las Vegas Ice & Cold Storage Co. v. Far W. Bank, 893 F.2d at 1185 (quoting State Distribs., Inc. v. Glenmore  Distilleries Co., 738 F.2d 405 (10th Cir. 1984)).  Along the same vein, the court will deny amendment if the party learned of the facts upon which its proposed amendment is based and nevertheless unreasonably delayed in moving to amend its complaint.  See Pallottino v. City of Rio Rancho, 31 F.3d 1023, 1027 (10th Cir. 1994)(noting motion to amend filed "was not based on new evidence unavailable at the time of the original filing").

Refusing leave to amend is generally justified only upon a showing of undue delay, undue prejudice to the opposing party, bad faith or dilatory motive, failure to cure deficiencies by amendments previously allowed, or futility of amendment.  See Castleglen, Inc. v. Resolution Trust Corp., 984 F.2d 1571, 1585 (10th Cir. 1993)(citing Foman v. Davis, 371 U.S. at 182).  Again, the matter is left to the Court's discretion.  Frank v. U.S. W., Inc., 3 F.3d at 1365-66.  See Duncan v. Manager, Dep't of Safety, City & Cty. of Denver, 397 F.3d 1300, 1315 (10th Cir. 2005)(quoting Frank v. U.S. West, Inc., 3 F.3d at 1365-66, and stating that resolving the issue whether to allow a plaintiff to file a supplement to his complaint is "well within the discretion of the district court"). "The . . . Tenth Circuit has emphasized that '[t]he purpose of [rule 15(a) is to provide litigants the maximum opportunity for each claim to be decided on its merits rather than on procedural niceties.'"  B.T. ex rel. G.T. v. Santa Fe Pub. Schs., No. CIV 05-1165 JB/RLP, 2007 WL 1306814, at *2 (D.N.M. March 12, 2007)(Browning, J.)(quoting Minter v. Prime Equip. Co., 451 F.3d 1196, 1204 (10th Cir. 2006)).  "Specifically, the . . . Tenth Circuit has determined that district courts should grant leave to amend when doing so would yield a meritorious claim."  Burleson v. ENMR-

Plateau Tel. Co-op., 2005 WL 3664299 at *2 (citing Curley v. Perry, 246 F.3d at 1284).

## LAW REGARDING LMRA PREEMPTION

In Caterpillar Inc. v. Williams, 482 U.S. 386 (1987), the Supreme Court articulated the doctrine of complete preemption:

> On occasion, the Court has concluded that the pre-emptive force of a statute is so "extraordinary" that it "converts an ordinary state common-law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule." Metropolitan Life Ins. Co. [v. Taylor, 481 U.S. 58, 65 (1987)]. Once an area of state law has been completely pre-empted, any claim purportedly based on that pre-empted state law is considered, from its inception, a federal claim, and therefore arises under federal law. See Franchise Tax Bd. [of State of Cal. v. Construction Laborers Vacation Trust for S. Cal., 463 U.S. 1, 24 (1983)]("If a federal cause of action completely pre-empts a state cause of action any complaint that comes within the scope of the federal cause of action necessarily 'arises under' federal law").

482 U.S. at 393. The Supreme Court has held that the LMRA's § 301 has complete preemptive force. See Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Trust for S. Cal., 463 U.S. at 23. "Section 301 of the LMRA governs claims founded directly on rights created by collective-bargaining agreements, and also claims substantially dependent on analysis of a collective-bargaining agreement, although it does not contain an explicit preemption provision." Felix v. Lucent Techs., Inc., 387 F.3d 1146, 1163-64 (10th Cir. 2004)(footnote omitted)(citation omitted)(internal quotation marks omitted).

### 1.    General Preemption Principles Under the LMRA.

The LMRA's § 301 provides:

> Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

29 U.S.C. § 185(a).  The Tenth Circuit has explained that § 301 "preempts questions relating to what the parties to a labor agreement agreed, and what legal consequences were intended to flow from breaches of that agreement, . . . whether such questions arise in the context of a suit for breach of contract or in a suit alleging liability in tort."  Cisneros v. ABC Rail Corp., 217 F.3d 1299, 1302 (10th Cir. 2000)(citations omitted)(internal quotation marks omitted).  Accord Carroll v. City of Albuquerque, 749 F. Supp. 1216, 1223-24 (D.N.M. 2010)(Browning, J.).

In Allis-Chalmers Corp. v. Lueck, the Supreme Court set forth the standard for determining when § 301 completely preempts a state law claim: "[W]hen resolution of a state-law claim is substantially dependent upon analysis of the terms of an agreement made between the parties in a labor contract, that claim must either be treated as a § 301 claim or dismissed as pre-empted by federal labor-contract law."  471 U.S. at 220 (citation omitted).  In Allis-Chalmers Corp. v. Lueck, the plaintiff brought a state tort claim against his employer for the bad-faith processing of an insurance claim.  See 471 U.S. at 206.  The Supreme Court concluded that § 301 completely preempted the cause of action, because "the duties imposed and rights established through the state tort . . . derive from the rights and obligations established by the [collective-bargaining] contract," and resolution of the dispute would therefore "inevitably . . . involve contract interpretation."  471 U.S. at 217-18.  The Supreme Court noted, however, that "it would be inconsistent with congressional intent under [§ 301] to pre-empt state rules that proscribe conduct, or establish rights and obligations, independent of a labor contract."  471 U.S. at 212.

Subsequently, in Caterpillar Inc. v. Williams, the Supreme Court considered whether § 301 permits employees, whom a CBA covers, to bring state law contract claims for breach of individual contracts between each employee and their employer.  See 482 U.S. at 388.  After reiterating that § 301 "governs claims founded directly on rights created by collective-bargaining agreements, and

also claims substantially dependent on analysis of a collective bargaining agreement," the Supreme

Court concluded that federal law does not preempt the employees' state claims for breach of their

individual employment contracts.   482 U.S. at 394 (internal quotation marks omitted).   The

Supreme Court reasoned:

> Section 301 says nothing about the content or validity of individual employment contracts.  It is true that respondents, bargaining unit members at the time of the plant closing, possessed substantial rights under the collective agreement, and could have brought suit under § 301.  As masters of the complaint, however, they chose not to do so.

> Moreover, . . . respondents' complaint is not substantially dependent upon interpretation of the collective-bargaining agreement.  It does not rely upon the collective agreement indirectly, nor does it address the relationship between the individual contracts and the collective agreement.

482 U.S. at 394-95.  Accord Voilas v. Gen. Motors Corp., 170 F.3d at 373-74 (stating that, "under

Caterpillar, employees have the option of vindicating their interests by means of either a section

301 action or an action brought under state law, as long as the state-law action as pleaded does not

require interpretation of the collective bargaining contract").

### 2.      Determining Whether Claims Are Inextricably Intertwined with Existing CBA Provisions.

"Preemption arises only when an 'evaluation of the . . . claim is *inextricably intertwined*

with consideration of the terms of the labor contract.'"  Mowry v. United Parcel Service, 415 F.3d

at 1152 (emphasis in original)(quoting Allis-Chalmers Corp. v. Lueck, 471 U.S. at 213).  "As long

as the state-law claim can be resolved without interpreting the agreement itself, the claim is

'independent' of the agreement for § 301 pre-emption purposes."  Lingle v. Norge Div. of Magic

Chef, Inc., 486 U.S. at 399.

In Lingle v. Norge Division of Magic Chef, Inc., the Supreme Court considered whether

§ 301 completely preempted an employee's state law retaliatory discharge claim against her

employer.  See 486 U.S. at 401.  The Supreme Court's analysis focused first upon the elements

necessary to make a prima facie retaliatory discharge claim under the relevant state law:

(i) discharge or a threat of discharge; and (ii) a motive to deter the employee from exercising her

rights.  See 486 U.S. at 407.  These elements, the Supreme Court noted, constituted "purely factual

questions pertain[ing] to the conduct of the employee and the conduct and motivation of the

employer," neither of which "require[d] a court to interpret any term of a collective-bargaining

agreement."  486 U.S. at 407.  Accordingly, the Supreme Court concluded that the employee's

state claim was "independent" of the relevant CBA for purposes of § 301, because "resolution of

the state-law claim did not require construing the collective-bargaining agreement."  486 U.S.

at 407.  Moreover, the Supreme Court found it irrelevant that "the state-law analysis might well

involve attention to the same factual considerations as the contractual determination of whether

[the employee] was fired for just cause [under her CBA]."  486 U.S. at 408.  "[S]uch parallelism,"

according to the Supreme Court, would not "render [ ] the state-law analysis dependent upon the

contractual analysis."  486 U.S. at 408.  The Supreme Court opined that the reason for this principle

was that

> [Section] 301 pre-emption merely ensures that federal law will be the basis for
> interpreting collective-bargaining agreements, and says nothing about the
> substantive rights a State may provide to workers when adjudication of those rights
> does not depend upon the interpretation of such agreements.  In other words, even
> if dispute resolution pursuant to a collective-bargaining agreement, on the one hand,
> and state law, on the other, would require addressing precisely the same set of facts,
> as long as the state-law claim can be resolved without interpreting the agreement
> itself, the claim is "independent" of the agreement for § 301 pre-emption purposes.

486 U.S. at 409-10.

In Mowry v. United Parcel Service, the Tenth Circuit evaluated each of the plaintiff's

claims "to determine whether they [were] 'inextricably intertwined' with existing provisions of his

collective-bargaining agreement and, as a result, preempted by § 301 of the LMRA."  415 F.3d at 1152.  The plaintiff's first claim -- retaliatory discharge in violation of public policy -- was based on his allegation that United Parcel Service terminated him for refusing to drive when weather and road conditions posed a risk of injury, in violation of statutory regulations stating that commercial drivers must discontinue operation of vehicles in dangerous conditions.  See 415 F.3d at 1152-53. The plaintiff argued that, based on the statutory and regulatory provisions, his retaliatory discharge claim was subject to evaluation independent of any interpretation of the CBA and, as a result, § 301 did not preempt the retaliatory discharge claim.  See 415 F.3d at 1153.  The defendant countered that federal law preempted the claim, because: (i) each of the statutory and regulatory provisions on which the plaintiff relied were expressly incorporated into the CBA, and thus resolution of his retaliation claim necessarily would involve an interpretation of the CBA; and (ii) each element of the retaliation claim required or was substantially dependent on interpretation of the CBA, and thus the claim and the CBA were inextricably intertwined.  See 415 F.3d at 1153. The Tenth Circuit did not find persuasive the defendant's assertion that resolution of the plaintiff's retaliatory discharge claim involved interpretation of the CBA solely because it expressly incorporated the statutory provisions upon which the plaintiff relied.  See 415 F.3d at 1153.  "To the contrary, it actually makes the [CBA] dependent on interpretations of federal and state safety regulations."  415 F.3d at 1153.  The Tenth Circuit concluded that federal law did not preempt the plaintiff's state law retaliation claim solely because the CBA incorporated the safety regulations upon which he based his claim.  See 415 F.3d at 1153.  The Tenth Circuit, nevertheless, found that the LMRA's § 301 preempted the plaintiff's second claim -- that the defendant "shorted his [pay]checks and he was discharged," because he complained about inadequate pay.  415 F.3d at 1153.  The Tenth Circuit explained:

In order to resolve the claim, a court would have to determine what work [the plaintiff] performed, when he worked, whether delays occurred and, if so, whether he was entitled to be paid for those delays.  The court would also have to determine what wages he should have been paid, what wages he actually was paid, whether he was underpaid, and, if so, the amount of the shortfall.  All of these issues are regulated by the [CBA] and, thus, require consideration of the collective bargaining agreement.  Article 17 of the [CBA] expressly assures full payment for all hours worked and specifically addresses rates of pay, computation of time worked, credit for certain delays that occur through no fault of the employee, and procedures for obtaining full payment of wages.  In sum, because [the plaintiff's] wage and compensation claim is substantially dependent on analysis of the wage and compensation provisions of the collective bargaining agreement, that claim is preempted by federal labor law.

415 F.3d at 1157.  The Tenth Circuit also found that § 301 preempted the plaintiff's third claim -- that the termination constituted intentional infliction of emotional distress.  See 415 F.3d at 1157.  The Tenth Circuit found that "determining whether [the defendant's] conduct in terminating [the plaintiff] was 'outrageous' requires construction of [the defendant's] rights and obligations under the [CBA], as that is the reference point against which [the defendant's] action must be scrutinized."  415 F.3d at 1158 (internal citation and quotation omitted).

In Garley v. Sandia Corp., the plaintiff, alleged, among other claims, a claim of breach of implied contract.  See 236 F.3d at 1206.  The plaintiff alleged that the defendant's code of ethics, personnel policies, and director's memorandum formed an express and implied contract, which the defendant breached when it failed to follow the criteria stated for progressive disciplinary policy.  See 236 F.3d at 1205.  The plaintiff argued that his claim was not founded on the collective-bargaining agreement, but rather was based exclusively on implied contracts that the defendant's personnel policy, code of ethics, and director's memorandum created.  See 236 F.3d at 1210.  Consequently, the plaintiff argued that the collective-bargaining agreement was irrelevant to his claim and that a court had no need to interpret the collective-bargaining agreement.  See 236 F.3d at 1210.  The district court found that the breach-of-implied-contract claim revolved around the

manner in which the defendant conducted its investigation of suspected employee misconduct and the way in which the plaintiff was terminated.  See 236 F.3d at 1206.  The district court cited the articles of the collective-bargaining agreement governing management of the business and treatment of employees performing council duties, and found that an analysis whether the defendant acted properly would inevitably require an analysis of the collective-bargaining agreement and what it permitted, and thus found § 301 preemption.  See 236 F.3d at 1206.  The Tenth Circuit affirmed the district court's finding of preemption with regards to the breach-of-implied-contract claim.  See 236 F.3d at 1211.

In Cumpston v. Dyncorp Technical Service, Inc., the plaintiff brought, among other claims, an implied-contract claim based on the defendant's business ethics standards, which forbade harassment of any nature.  See 76 F. App'x at 862.  He argued that the individual defendants' actions constituted proscribed harassment and that, by allowing such conduct, the defendant breached the duty it assumed -- separate from the collective-bargaining agreement -- by issuing the business ethics standards.  See 76 F. App'x at 863.  The district court disagreed, holding that, despite its separate origin, the implied-contract claim was inextricably intertwined with consideration of the terms of the collective-bargaining agreement, and that, the LMRA, thus, preempted the claim.  See 76 F. App'x at 863.  The Tenth Circuit stated:

> It is difficult to say in the abstract whether [the defendant's] standards were intended to be read in conjunction with the [collective-bargaining agreement], but we need not resolve that question to decide the preemption issue in this case.  Even if there is no general intrinsic connection between the [collective-bargaining agreement] and the standards, consideration of the [collective-bargaining agreement] would still be necessary to assess the merit of plaintiff's allegations regarding breach of the implied contract for two particularized and interrelated reasons.  Because the prohibition on "harassment" set out in the standards is devoid of descriptive content, and the actions plaintiff complains of are not on their face so inherently or plainly wrongful as to make application of such a label ineluctable, there would be no way of telling whether the standards were violated here without

> consulting the [collective-bargaining agreement] to assess the opposing rights and privileges of the parties.  Thus, the [collective-bargaining agreement] would be indispensable to a proper resolution of the implied-contract claim, which is, therefore, preempted under the LMRA.

76 F. App'x at 864 (footnote omitted).

In Carroll v. City of Albuquerque, the plaintiff, among other claims, asserted a claim of breach of implied contract.  See 749 F. Supp. at 1220.  The plaintiff alleged that the defendant's Interoffice Memorandum, Personnel Rules and Regulations, Merit System Ordinance, and Procedures Manual formed an implied employment contract, which the defendant breached when it hired another employee for the position of Traffic Program Specialist over the plaintiff.  See 749 F. Supp. at 1220, 1231.  The plaintiff argued that it was not necessary to look to the CBA to determine whether the defendant's policies gave rise to an implied employment contract and contended that the defendant's personnel rules were completely independent of the CBA.  See 749 F. Supp. at 1221.  The Court concluded that the documents upon which the plaintiff relied to support his implied contract claim were inextricably intertwined with the CBA, and that the Court could not ignore the CBA in its analysis whether the policies and ordinances created an implied employment contract.  See 749 F. Supp. at 1234.  The Court explained that assessing the defendant's actions would also require the Court to construe the CBA's terms to see how they overlapped with the policies that the plaintiff alleged were breached.  See 749 F. Supp. at 1234.  The Court therefore concluded that § 301 preempted the plaintiff's implied contract claims, denied the plaintiff's motion to remand, and provided the plaintiff with ten days to amend his breach-of-implied-contract claims to state a § 301 claim.  See 749 F. Supp. at 1234.

In Perez v. Qwest Corp., the plaintiff alleged an assault and battery claim.  See 883 F. Supp. 2d at 1101.  The plaintiff alleged that the CBA preempted his assault and battery claim.  See 883

F. Supp. 2d at 1125-26.  The Court concluded that the CBA did not contain a provision addressing physical altercations between employees such that a court might have to consult the CBA to result such a claim.  See 883 F. Supp. 2d at 1125.  The Court explained that "people face common-law liability for assaulting and battering one another, independent of any collective bargaining provision to that effect" and noted that the employee had not pled that the CBA had any provision that related to assault or battery.  See 883 F. Supp. 2d at 1125.  The Court also rejected the plaintiff's contention that the Court would need to consult the CBA's provisions relating to injured/ill employees to determine whether an assault or battery occurred.  See 883 F. Supp. 2d at 1126.  The Court therefore held that § 301 did not preempt the employee's assault and battery claim.  See 883 F. Supp. 2d at 1126.

### 3.    Distinction Between Interpretation of the CBA and Consultation of the CBA.

"The Supreme Court has outlined a key distinction between a claim that involves interpretation of [CBA] terms and one that involves mere reference to those terms, with only the former requiring complete preemption under § 301 of the LMRA."  Felix v. Lucent Techs., Inc., 387 F.3d at 1164.  "The mere need to 'look to' the collective-bargaining agreement for damages computation is no reason to hold the state-law claim defeated by § 301."  Livadas v. Bradshaw, 512 U.S. at 125 (citing Lingle v. Norge Div. of Magic Chef, 486 U.S. at 413 n.12).  "Especially when the [CBA] terms are undisputed, the court's limited reference to the collective-bargaining agreement to confirm damages is not sufficient to remove a state law claim on the ground that it is completely preempted by § 301 of the LMRA."  Felix v. Lucent Techs., Inc., 387 F.3d at 1165.  See Foy v. Pratt & Whitney Grp., 127 F.3d 229, 233 (2d Cir. 1997)(emphasizing difference between interpretation of a CBA and consultation of a CBA).

## LAW REGARDING THE NMHRA

The NMHRA, which is administered by the Human Rights Division and the NMHRB, makes it an unlawful discriminatory practice for

> an employer, unless based on a bona fide occupational qualification or other statutory prohibition, to refuse to hire, to discharge, to promote or demote or to discriminate in matters of compensation, terms, conditions or privileges of employment against any person otherwise qualified because of race, age, religion, color, national origin, ancestry, sex, physical or mental handicap or serious medical condition, or, if the employer has fifty or more employees, spousal affiliation; provided, however, that 29 U.S.C. Section 631(c)(1) and (2) shall apply to discrimination based on age; or, if the employer has fifteen or more employees, to discriminate against an employee based upon the employee's sexual orientation or gender identity[.]

N.M. Stat. Ann. § 28-1-7A.  The NMHRA allows individuals to bring a lawsuit in the appropriate district court after exhausting their administrative remedies.  See Luboyeski v. Hill, 1994-NMSC-032, ¶ 7, 872 P.2d 353, 355.  The NMHRA sets out the same standard for establishing wrongful discrimination as Title VII.  See Orr v. City of Albuquerque, 417 F.3d 1144, 1149 n.5 (10th Cir. 2005)("Plaintiffs' burden under the NMHRA is identical to their burden under Title VII."); Lobato v. N.M. Env't Dep't, 733 F.3d 1283, 1296-97 (10th Cir. 2013)(holding that, "because we conclude that Lobato has no Title VII claim, we also conclude he has no NMHRA claim").  The NMHRA requires an individual to first exhaust his or her administrative remedies before bringing a lawsuit. See Luboyeski v. Hill, 1994-NMSC-032, ¶ 7, 872 P.2d at 355; Bates v. N.M. Corr. Dep't, No. CIV 08-1013, 2010 WL 4339367, at *7 (D.N.M. Sept. 30, 2010)(Browning, J.)("NMHRA claims must be administratively exhausted before being brought in federal court.").  The NMHRA provides:

> A person aggrieved by an order of the commission may obtain a trial de novo in the district court of the county where the discriminatory practice occurred or where the respondent does business by filing a notice of appeal within ninety days from the date of service of the [New Mexico Human Rights] commission's order.

N.M. Stat. Ann. § 28-1-13A.

The Supreme Court of New Mexico applies the framework that the Supreme Court of the United States established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), "[w]hen considering a violation of the NMHRA." Juneau v. Intel Corp., 2006-NMSC-002, ¶ 9, 127 P.3d 548, 551. The Supreme Court of New Mexico has stated that, "when considering claims under the NMHRA, we may look at federal civil rights adjudication for guidance in interpreting the NMHRA. Our reliance on the methodology developed in the federal courts, however, should not be interpreted as an indication that we have adopted federal law as our own." Ocana v. Am. Furniture Co., 2004-NMSC-018, ¶ 23, 91 P.3d 58, 68 (internal quotation marks omitted)(citations omitted). "[C]laims of age, race, national origin, gender discrimination, and retaliation are all subject to the burden shifting framework that the Supreme Court established in McDonnell Douglas Corp. v. Green." Gamez v. Country Cottage Care and Rehab., 377 F. Supp. 2d 1103, 1119 (D.N.M. 2005)(citing McDonnell Douglas Corp. v. Green, 411 U.S. at 802-804). Under the McDonnell Douglas Corp. v. Green framework, a plaintiff must set forth a prima-facie case of discrimination. See Kelley v. City of Albuquerque, 375 F. Supp. 2d 1183, 1210 (D.N.M. 2004)(Browning, J.). If the plaintiff establishes a prima-facie case for any of his discrimination claims, "the burden shifts to the defendant to come forward with a legitimate nondiscriminatory reason for its employment related decision." McDonnell Douglas Corp. v. Green, 411 U.S. at 802. "Upon the employer's articulation of a legitimate, nondiscriminatory reason . . . the presumption of discrimination established by the prima facie case simply drops out of the picture." Kelley v. City of Albuquerque, 375 F. Supp. 2d at 1210 (internal quotations omitted). The plaintiff then must present evidence that the defendant's proffered reason for the employment decision was pretextual. See Kelley v. City of Albuquerque, 375 F. Supp. 2d at 1210 (citing Kendrick v. Penske Transp. Servs., Inc., 220 F.3d 1220, 1230 (10th Cir. 2000)). The Supreme Court of New Mexico

has stated that the framework it applies to discrimination claims under the NMHRA is as follows:
"[A]n employee bears the initial burden of demonstrating a prima facie case of discrimination,
which then shifts the burden to the employer to provide a legitimate, non-discriminatory reason
for the adverse employment action.  The employee then has the opportunity to rebut the employer's
proffered reason as pretextual or otherwise inadequate." Juneau v. Intel Corp., 2006-NMSC-002,
¶ 9, 127 P.3d at 551 (citing McDonnell Douglas Corp. v. Green, 411 U.S. at 802-05).  This
approach is the same as the McDonnell Douglas Corp. v. Green framework.

While New Mexico uses federal law to interpret the NMHRA, there may be two ways in
which the NMHRA is broader than federal law.  First, as this Court has previously acknowledged,
the Supreme Court of New Mexico allows for personal liability under the NMHRA.  See Duprey
v. Twelfth Judicial Dist. Court, No. CIV 08-0756 JB, 2009 WL 2482170, at *7 (D.N.M. July 28,
2009)(Browning, J.).  The NMHRA defines "employer" as "any person employing four or more
persons and any person acting for an employer."  N.M. Stat. Ann. § 28-1-2B.  While
acknowledging that there is generally no personal liability under Title VII, the Supreme Court of
New Mexico has "reject[ed] the proposition that there can exist no individual liability under the
NMHRA." Sonntag v. Shaw, 2001-NMSC-015, ¶ 13, 22 P.3d 1188, 1193.  In Sonntag v. Shaw, a
defendant relied on Title VII case law to argue that employees cannot sue a corporation's owner
in the owner's individual capacity under the NMHRA.  See 2001-NMSC-015, ¶ 13, 22 P.3d
at 1193.  Although it held that the defendant could not be held personally liable, given that the
plaintiff had failed to exhaust administrative remedies, the Supreme Court of New Mexico
declined to close the door on individual liability under the NMHRA.  See 2001-NMSC-015, ¶ 13,
22 P.3d at 1193.  The Supreme Court of New Mexico noted:

> [T]his Court has acknowledged the possibility of individual liability for discrimination claims.  Cf. Luboyeski v. Hill, 117 N.M. 380, 382, 872 P.2d 353, 355 (1994)(affirming the dismissal of individual defendants because the plaintiff failed to exhaust administrative remedies against them); Mitchell-Carr v. McLendon, 1999-NMSC-025, ¶ 10, 127 N.M. 282, 980 P.2d 65 (citing Luboyeski).  As Plaintiff suggests, the potential for individual liability for discrimination claims is rooted in the language of the NMHRA itself, which forbids "any person" from supporting a discriminatory practice.  Section 28-1-7(i); see N.M.S.A. 1978, § 28-1-2(A) (1993)(including within its definition of "person" for purposes of the NMHRA, "one or more individuals").

2001-NMSC-015, ¶ 12, 22 P.3d at 1193.  Second, the NMHRA's definition of "serious medical condition," N.M. Stat. Ann. § 28-1-7, may be broader in scope than the ADA's definition of disability.  See Clayton v. Pioneer Bank, No. 07-0680, 2008 WL 5787472, at *17-18 (D.N.M. Dec. 31, 2008)(Browning, J.)(recognizing that, although "the terms 'medical condition' under the NMHRA, and 'disability,' under the ADA, may be interchangeable in some cases[,]" they may not be the same in others).

## LAW REGARDING EXHAUSTION OF ADMINISTRATIVE REMEDIES

Both Title VII and NMHRA claims must be administratively exhausted before being brought in federal court.  Title VII creates a work-sharing deferral system between the EEOC and the states that have their own employment discrimination legislation.  See 42 U.S.C. § 2000e-5(c), (d).  In the states that possess their own employment discrimination legislation, the EEOC must generally "defer" to state or local remedies.  EEOC v. Superior Temp. Servs., Inc., 56 F.3d 441, 447 (2d Cir. 1995)(quoting 42 U.S.C. § 2000e-5(c), (d)).  The NMHRA places New Mexico among those states that have their own employment discrimination legislation and contact agencies.  See 29 C.F.R. § 1601.74 (2005).   In New Mexico, a complainant can, upon meeting filing requirements, proceed with his or her grievance either through the EEOC or through the New Mexico Human Rights Division.  See Mitchell-Carr v. McLendon, 1999-NMSC-025, ¶¶ 10-19,

980 P.2d at 69-70.  "In a State that has an entity with the authority to grant or seek relief with respect to the alleged unlawful practice, an employee who initially files a grievance with that agency must file the charge with the EEOC within 300 days of the employment practice."  Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 109 (2002).  Once a person elects to proceed with his or her complaint under state law, the NMHRA controls the grievance procedures for resolving the complaint.  See Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. at 109.

Whether complainants decide to pursue their grievances with the EEOC or with the NMHRB they must exhaust their respective regimes' administrative remedies before seeking judicial review.  See Jones v. Runyon, 91 F.3d 1298, 1399 (10th Cir. 1996)("Exhaustion of administrative remedies is a jurisdictional prerequisite to suit under Title VII."); Mitchell-Carr v. McLendon, 1999-NMSC-025, ¶ 20, 980 P.2d at 71 ("[E]xhaustion of administrative remedies is a prerequisite to suit under the NMHRA, and a failure to exhaust administrative remedies may mean that the court lacks subject-matter jurisdiction.")(citing Luboyeski v. Hill, 117-NMSC-380, 872 P.2d at 355).  Exhaustion of administrative remedies is central to Title VII's statutory scheme, because it provides the EEOC and state deferral agencies with the first opportunity to investigate discriminatory practices, and enables them to perform their roles of obtaining voluntary compliance and of promoting conciliatory efforts.  See Patterson v. McLean Credit Union, 491 U.S. 164, 180-81 (1989); Williams v. Little Rock Mun. Water Works, 21 F.3d 218, 222 (8th Cir. 1994).

**NEW MEXICO LAW REGARDING INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

The Supreme Court of New Mexico has adopted the Restatement (Second) of Torts' approach for intentional infliction of emotional distress.  See Baldonado v. El Paso Nat. Gas Co.,

2008-NMSC-005, ¶ 26, 176 P.3d 277, 283.  The Restatement (Second) provides that intentional infliction of emotional distress exists when:

> [(i)]   One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.
>
> [(ii)]   Where such conduct is directed at a third person, the actor is subject to liability if he intentionally or recklessly causes severe emotional distress
>
>> (a)   to a member of such person's immediate family who is present at the time, whether or not such distress results in bodily harm, or
>>
>> (b)   to any other person who is present at the time, if such distress results in bodily harm.

Baldonado v. El Paso Nat. Gas Co., 2008-NMSC-005, ¶ 26, 176 P.3d at 283 (quoting Restatement (Second) of Torts § 46).  The elements of intentional infliction of emotional distress are: "[(i)] the conduct in question was extreme and outrageous; [(ii)] the conduct of the defendant was intentional or in reckless disregard of the plaintiff; [(iii)] the plaintiffs mental distress was extreme and severe; [and (iv)] there is a causal connection between the defendant's conduct and the claimant's mental distress."  Baldonado v. El Paso Nat. Gas Co., 2008-NMSC-005, ¶ 27, 176 P.3d at 283 (internal quotations omitted).  The Supreme Court of New Mexico interprets these elements as "merely restat[ing] the first prong of the *Restatement* test."  Baldonado v. El Paso Nat. Gas Co., 2008-NMSC-005, ¶ 27, 176 P.3d at 283.  Most intentional infliction of emotional distress claims arise from a preexisting relationship between the plaintiff and the defendant -- such as employer/employee.  See Baldonado v. El Paso Nat. Gas Co., 2008-NMSC-005, ¶ 27, 176 P.3d at 283.

"Extreme and outrageous conduct is described as conduct so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Silverman v. Progressive Broad., Inc., 1998-NMCA-107, ¶ 32, 964 P.2d 61, 70 (internal quotations omitted).  Severe emotional distress means "a reasonable person, normally constituted, would be unable to cope adequately with the mental distress engendered by the circumstances." Silverman v. Progressive Broad., Inc., 1998-NMCA-107, ¶ 33, 964 P.2d at 71 (internal quotations omitted).  "Improper treatment does not constitute severe emotional distress as contemplated under the tort." Silverman v. Progressive Broad., Inc., 1998-NMCA-107, ¶ 33, 964 P.2d at 71.

In E.E.O.C. v. University of Phoenix, Inc., 505 F. Supp. 2d 1045 (D.N.M. 2007)(Browning, J.), Loretta Grado, an employee working as a Program Specialist at the University of Phoenix, intervened in a lawsuit filed by the EEOC against the University, asserting claims for, among other things, intentional infliction of emotional distress.  See 505 F. Supp. 2d at 1049-53.  The University moved for summary judgment, asking the Court to grant judgment in its favor on all of her claims.  See 505 F. Supp. 2d at 1049-53. The Court granted summary judgment in the University's favor on Grado's intentional infliction of emotional distress claim. See 505 F. Supp. 2d at 1062-63.  The Court concluded that Grado had not presented evidence of extreme and severe emotional distress where she had alleged that the campus director's behavior towards her

> made her feel like vomiting, caused her to have between five and ten nightmares, caused her to lose sleep, led her to seek medical assistance, led her to take some sample medications her physician provided, and prevented her from caring for her children for a month, because she was too tired and emotionally distracted to do so.

E.E.O.C. v. Univ. of Phoenix, Inc., 505 F. Supp. 2d at 1062.  The Court explained that Grado

presented evidence that she had suffered emotional distress similar to that of which the plaintiff

complained in Trujillo v. N. Rio Arriba Elec. Coop., Inc., 2002-NMSC-004, 41 P.3d 333.  See 505

F. Supp. 2d at 1063.  The Court explained that, in Trujillo v. N. Rio Arriba Elec. Coop., Inc., the

plaintiff presented evidence that he felt "lousy," was depressed, was prescribed Prozac, slept long

hours, and displayed erratic eating habits.  505 F. Supp. 2d at 1062-63 (citing Trujillo v. N. Rio

Arriba Elec. Coop., Inc., 2002-NMSC-004, ¶ 28, 41 P.3d at 333).  The Court concluded:

> The New Mexico Supreme Court held that such evidence was insufficient to satisfy
> the extreme and severe emotional distress element of an intentional infliction of
> emotional distress claim. . . .  Applying New Mexico precedent to this case, the
> Court finds that the evidence of distress Grado presents is similarly insufficient to
> meet the tort claim's extreme and severe element.  As such, the Court concludes
> that the University is entitled to summary judgment on Grado's intentional
> infliction of emotional distress claim.

E.E.O.C. v. Univ. of Phoenix, Inc., 505 F. Supp. 2d at 1063.

## LAW REGARDING SANCTIONS UNDER RULE 11

Rule 11 of the Federal Rules of Civil Procedure provides in relevant part:

> (b)    **Representations to the Court.** By presenting to the court a
> pleading, written motion, or other paper—whether by signing, filing, submitting,
> or later advocating it—an attorney or unrepresented party certifies that to the best
> of the person's knowledge, information, and belief, formed after an inquiry
> reasonable under the circumstances:
>
>> (1)    it is not being presented for any improper purpose, such as
>> to harass, cause unnecessary delay, or needlessly increase the cost
>> of litigation;
>> (2)    the claims, defenses, and other legal contentions are
>> warranted by existing law or by a nonfrivolous argument for
>> extending, modifying, or reversing existing law or for establishing
>> new law;
>> (3)    the factual contentions have evidentiary support or, if
>> specifically so identified, will likely have evidentiary support after
>> a reasonable opportunity for further investigation or discovery; and

> (4)    the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on belief or a lack of information.

Fed. R. Civ. P. 11.  "If after reasonable inquiry, a competent attorney could not form a reasonable belief that [a] pleading is well grounded in fact and is warranted by existing law ... then such conduct is sanctionable under Rule 11."  Adamson v. Bowen, 855 F.2d 668, 673 (10th Cir.1988) (internal quotation marks omitted).  "The main purpose behind rule 11 sanctions is misconduct deterrence not defense compensation."  Duprey v. Twelfth Judicial Dist. Court, No. 08–0756, 2009 WL 2424618, at *8 (D.N.M. July 14, 2009)(Browning, J.)(citing Kirk Capital Corp. v. Bailey, 16 F.3d 1485, 1490 (8th Cir. 1994)).  Accord Fed. R. Civ. P. 11(c)(4). "Sanctions are not warranted where there is a minor or tangential misrepresentation."  Estate of Gonzales v. AAA Life Ins. Co., No. 11-0486, 2012 WL 1684599, at *4 (D.N.M. May 8, 2012)(Browning, J.)(citing Carona v. Falcon Servs. Co., Inc., 72 F. Supp. 2d 731, 733 (S.D. Tex. 1999)). "If, considering the 'totality of the circumstances,' the court finds that the misrepresentation is an honest mistake, sanctions are not warranted."  Estate of Gonzales v. AAA Life Ins. Co., 2012 WL 1684599, at *4 (quoting Carona v. Falcon Servs. Co., Inc., 72 F. Supp. 2d at 733).

## ANALYSIS

The Court grants the MTD and dismisses Counts III through VI of the Complaint.  The Court further grants Lucero leave to amend Count III and Count VI.  The Court denies the Motion for Default.

## I.    THE COURT WILL DISMISS COUNTS III THROUGH VI, BUT IT WILL GRANT LUCERO LEAVE TO AMEND COUNTS III AND VI.

The plaintiff has the burden "to provide fair notice of the grounds for the claims made against each of the defendants."  Robbins v. Oklahoma, 519 F.3d at 1250.  In the plaintiff's

complaint, the plaintiff must "make clear exactly *who* is alleged to have done *what to whom*, to provide each individual with fair notice as to the basis of the claim against him or her." Robbins v. Oklahoma, 519 F.3d at 1249-1250 (emphasis in original).  If the plaintiff does not specify which defendants committed the facts that make up a claim, or what facts underlying the claims the defendants committed, it would be "impossible for any of these individuals to ascertain what particular unconstitutional acts they are alleged to have committed." Robbins v. Oklahoma, 519 F.3d at 1250.  The Court concludes that, because Lucero does not always refer to Martinez and Salazar or specify what conduct they committed in each of Counts III through VI, the Court will dismiss these counts.  It will, however, dismiss Counts III and VI without prejudice and grant Lucero leave to amend these Counts.

### A.   THE COURT WILL DISMISS COUNT III WITHOUT PREJUDICE AND GRANT LUCERO LEAVE TO AMEND THIS COUNT.

The Court will first dismiss Count III against Martinez and Salazar without prejudice.  The Complaint's Count III is a claim for "prima facie tort -- negligent supervision, retention and training of management."  Complaint at 16.   Lucero clarifies in his Response that the underlying lawful action by the tortfeasor for Count III is the "hir[ing], supervision, [and] retention of employees who abused the Plaintiff."  Reply at 7.  In the Complaint's Count III, Lucero does not mention Martinez or Salazar nor does he say that Martinez or Salazar hired, supervised, or retained employees who abused Lucero.  Rather he alleges only that Martinez and Salazar "had supervisory and managerial roles."  Response at 2.  He does mention another Defendant, Vigil, by name while alleging that Vigil was permitted to "ostracize" Lucero and that Vigil was not trained properly.  Complaint ¶ 72, at 17.  When elaborating on the prima facie tort in his response, Lucero again does not mention Martinez or Salazar at all.  See Response at 23-24.  Thus, the Court concludes that,

without more information, Lucero does not make any actual allegations against Martinez and Salazar for a prima facie tort, and so the Court dismisses Count III.

Under New Mexico law, there are four elements of a prima facie tort that are generally recognized: "'(i) commission of an intentional, lawful act; (ii) an intent to injure the plaintiff; (iii) injury to the plaintiff as a result of the intentional act; and (iv) the absence of sufficient justification for the injurious act.'"   Simon v. Taylor, 252 F. Supp. 3d 1196, 1232 (D.N.M. 2017)(Browning, J.)(quoting Lexington Ins. Co. v. Rummel, 1997-NMSC-043, ¶ 19, 945 P.2d 992, 995).  Lucero thus needs to plead specific conduct that is both intentional and lawful.  Thus, if Lucero amends his Complaint to allege unlawful conduct, the Court would again dismiss this Count of Lucero's Complaint.  The Court will permit Lucero to amend this Count, but it warns Lucero that unless he gives specific names and facts, and alleges unlawful conduct, his amended Count III will not survive dismissal.

### B.   LUCERO CANNOT BRING COUNT IV, BECAUSE HE DID NOT EXHAUST HIS ADMINISTRATIVE REMEDIES, BUT EVEN IF HE HAD EXHAUSTED HIS ADMINISTRATIVE REMEDIES, THE COURT WOULD DISMISS COUNT IV.

For Lucero to bring a valid Count IV claim -- discriminatory discharge in violation of the NMHRA -- against Martinez and Salazar, he must have exhausted his administrative remedies against them.  See Muffoletoo v. Christus St. Vincent Reg'l Med. Ctr., 2015 WL 9943427, at *5 (D.N.M. Nov. 19, 2015)(Vázquez, J.)("Although the NMHRA provides for individual, personal liability in discrimination cases, it also demands that 'a party must exhaust his or her administrative remedies *against a party* before bringing an action in district court *against that party*.'" (quoting Sonntag v. Shaw, 2001-NMSC-015, ¶ 13, 22 P.3d at 1193)(emphasis in original)).   See Bates v. N.M. Corr. Dep't., 2010 WL 4339367, at *16 (citing Kelley v. City of Albuquerque, 375 F. Supp.

2d at 1214 ("Before a plaintiff can state a valid claim against an individual defendant under NMHRA, however, the plaintiff must first exhaust her administrative remedies.")); Benavidez v. Sandia Nat'l Labs., 212 F. Supp. 3d at 1085.

In Sonntag v. Shaw, the Supreme Court of New Mexico stated that, "[u]nder the NMHRA, a plaintiff must exhaust his or her administrative remedies against a party before bringing an action in district court against that party. . . ." Sonntag v. Shaw, 2001-NMSC-015, ¶ 13, 22 P.3d at 1193. Based on this requirement, the Supreme Court of New Mexico held that, "[i]n neglecting to name [the corporation's owner] personally, [the plaintiff] failed to exhaust her administrative remedies against him.  The trial court therefore erred in allowing Plaintiff's discrimination claim to be brought against [the owner] individually."   Sonntag v. Shaw, 2001-NMSC-015, ¶ 13, 22 P.3d  1193.

Similarly, in Luboyeski v. Hill, the Supreme Court of New Mexico addressed a case where the plaintiff "filed a complaint with the Division, naming the School System as respondent and claiming that Kermit Hill, another teacher at the school where [the plaintiff] taught, had touched and made advances toward her in sexually inappropriate ways." Luboyeski v. Hill, 117-NMSC-380, ¶ 3, 872 P.2d at 354.  Hill was "not named as [a] respondent[] in the proceeding before the Division and w[as] only added as defendants on [the plaintiff's] appeal to the district court." Luboyeski v. Hill, 117-NMSC-380, ¶ 7, 872 P.2d at 355.  The Supreme Court of New Mexico concluded that the plaintiff had not exhausted her administrative remedies against Hill, holding "that parties who have not been parties to an administrative proceeding should not be added on appellate review of that proceeding."  Luboyeski v. Hill, 117-NMSC-380, ¶ 7, 872 P.2d at 355 (internal citations and quotations omitted).

In Campos v. Las Cruces Nursing Center,  828 F. Supp. 2d 1256 (D.N.M. 2011)(Browning, J.), the Court addressed a case in which only one of the three plaintiffs named a defendant in her Charge of Discrimination.  See 828 F. Supp. 2d at 1277.  The other two plaintiffs, however, named the defendant in the text of their charges, and, "importantly, all three Plaintiffs specifically described the discriminatory conduct [the defendant] allegedly committed."  Campos v. Las Cruces Nursing Center, 828 F. Supp. 2d at 1277.  The Court determined that "the Supreme Court of New Mexico would likely recognize that complaining about a person in the text of a charge would be sufficient to name them as a respondent in the case" and concluded that the plaintiffs had exhausted their administrative remedies.  828 F. Supp. 2d at 1277 (citing Romero v. Union Pac. R.R., 615 F.2d 1303, 1310 (10th Cir. 1980)).

Here, similar to Campos v. Las Cruces Nursing Center, Lucero named both Martinez and Salazar in the charge's text:

> In October 2018, I was delivering poles to a location where Carlos Salazar and Alfonso Martinez were waiting in a truck.  Salazar called me to see where I was and how long I'd be, then left the line open so I could hear Salazar and Martinez talking about me.  They were saying how I gave good blow jobs.  I commented back that I got good blow jobs from their wives and that Salazar's wife was so fat you have to roll her in flour to find a wet spot; this made them angry.  When I arrived at their location, Salazar and Martinez got out of truck [sic], Salazar pushed me.  I pushed back, so I could get away but didn't do anything else because I was outnumbered; I got back in my truck and called Randy Vigil, who told me not to let it bother me and Vigil never followed up.

Charge of Discrimination at 1.  Thus, that they are in the text is enough for Lucero to have exhausted his remedies against them as long as the facts describe the conduct that Martinez and Salazar allegedly committed.  The NMHRA, in part, allows for claims when:

> an employer, unless based on a bona fide occupational qualification or other statutory prohibition, [] refuse[s] to hire, to discharge, to promote or demote or to discriminate in matters of compensation, terms, conditions or privileges of employment against any person otherwise qualified because of race, age, religion,

> color, national origin, ancestry, sex, sexual orientation, gender identity, pregnancy, childbirth or condition related to pregnancy or childbirth, physical or mental handicap or serious medical condition, or, if the employer has fifty or more employees, spousal affiliation; provided, however, that 29 U.S.C. Section 631(c)(1) and (2) shall apply to discrimination based on age.

N.M. Stat. Ann. § 28-1-7 (A).  Thus, because Lucero does not allege that Martinez and Salazar are his employers[8] who discharged him, the Court concludes that the Charge's text does not describe the claim, and thus Lucero has not exhausted his administrative remedies to bring a discriminatory discharge claim against Martinez and Salazar.

Even if Lucero could bring a discriminatory discharge claim against non-employers and thus had exhausted his administrative remedies, the Court would conclude that Lucero has not alleged facts against Martinez and Salazar that support a violation of NMHRA's discriminatory discharge provision.  Because Lucero does not allege that Martinez and Salazar discharged him or had a hand in his discharge, and because Lucero has added the word "harassment" in his discriminatory discharge claim, the Court assesses whether Lucero can bring a claim against Martinez and Salazar under a harassment theory.  Complaint at 17 (titling claim as "Discriminatory Discharge/Wrongful Termination and Harassment in Violation of the Human Rights Act").

---

[8]The Tenth Circuit has adopted the "cat's paw theory," which, in this context, "refers to a situation in which a biased subordinate, who lacks decisionmaking power, uses the formal decisionmaker as a dupe in a deliberate scheme to trigger a discriminatory employment action." E.E.O.C. v. BCI Coca-Cola Bottling Co. of L.A., 450 F.3d 476, 484 (10th Cir. 2006)(citing Llampallas v. Mini-Circuits, Lab, Inc., 163 F.3d 1236, 1249 (11th Cir. 1998)). This theory, however, does not make the subordinate employee liable; rather, it provides a circumstance in which "'a defendant may be held liable for a subordinate employee's prejudice even if the manager lacked discriminatory intent.'" E.E.O.C. v. BCI Coca-Cola Bottling Co. of L.A., 450 F.3d at 485. Thus, this theory cannot be used to conclude that an employee is liable for discriminatory discharge under NMHRA.

In Nava v. City of Santa Fe, the Supreme Court of New Mexico notes that, in the NMHRA context, it adopts the Supreme Court of the United States' interpretation of the phrase "compensation, terms, conditions or privileges" in Title VII "as prohibiting *inter alia* discriminatory conduct by employers that 'has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment." Meritor Savs. Bank, FSB v. Vinson, 477 U.S. 64-65 (1986)(quoting 29 C.F.R. § 1604.11(a)(3))(internal quotations omitted in Nava v. City of Santa Fe). See Ocana v. Am. Furniture Co., 2004-NMSC-018, ¶ 24, 91 P.3d at 69 (stating that, under the NMHRA, "sexual harassment is actionable under a hostile work environment theory when the offensive conduct becomes so severe and pervasive that it alters the conditions of employment in such a manner that the workplace is transformed into a hostile and abusive environment for the employee").

Lucero does not allege harassment so severe and pervasive as to change the conditions of employment.  He alleges only a single incident, in which he was pushed and insulted in a manner related to his sexuality.  While the Court is sympathetic to the upset the incident caused, a single incident is not pervasive.  Further, Lucero does not allege that the incident was sufficiently severe on its own to "transform" the workplace "into a hostile and abusive environment." Ocana v. Am. Furniture Co., 2004-NMSC-018, ¶ 24, 91 P.3d at 69.  See Nava v. City of Santa Fe, 2004-NMSC-039, ¶ 6, 103 P.3d 571, 574 (noting that harassment can be "'severe or pervasive to create an abusive work environment'")(quoting Lawrence Solotoff & Henry S. Kramer, Sex Discrimination and Sexual Harassment in the Work Place, § 304.[2], at 3-31 (2004)); id. at ¶¶ 14-15 (allowing that the following incidents in which the male sergeant harassed the female officer "may not have been," on their own, sufficiently "severe to support a hostile work environment claim": raising his voice at the officer; allowing male officers who missed their lunch to leave early, but not giving

the same option to the female officer; not relieving the female officer who had been at the crime scene for five hours while reliving male officers who had been there a shorter amount of time; following the female officer to her house and monitoring how long her bathroom breaks were; assigning rape calls to her when other officers were closer to the crime scene; collecting her reports at the end of her shift or after her shift, even though he collected male officers' reports hours before their shifts ended; throwing a file at the female officer).  Thus, Lucero has not alleged facts to support a claim under the NMHRA against Martinez and Salazar, even if he could bring a claim against individuals who are not his employers under the NMHRA discriminatory discharge provision.

Further, Count IV is not specific to support a claim against Martinez and Salazar.  In the Complaint's Count IV, Lucero does not mention Martinez or Salazar, stating only that the "unlawful conduct alleged above was engaged in by supervisors and/or managing agents of Jemez Cooperative " in the context of stating that Jemez Cooperative is strictly liable for this unlawful conduct.  Complaint ¶ 87, at 19.  See MTD Response at 2 (stating that Cooperative is the superior in its respondent superior relationship with Martinez and Salazar).  Nor does he clarify his claim in his Response to accuse Martinez and Salazar to be involved in Lucero's discharge.  See MTD Response at 8.  Thus, the Court would dismiss Count IV against Martinez and Salazar, because nothing in the text indicates the allegations are against Martinez and Salazar.

If Lucero wants to make an NMHRA claim against Martinez and Salazar, he will need to use a different provision of the NMHRA that is not reserved for use against employers.  The Court's conclusion remains the same: to state a claim under the NMHRA, Lucero needs to file a charge in which the claim against the defendants match the actions of the defendants and falls

under a provision of the NMHRA that allows claims against that type of defendant.  The Court

thus dismisses Count IV with prejudice against Martinez and Salazar.

> ### C.    LUCERO CANNOT BRING COUNT V, BECAUSE RETALIATORY DISCHARGE IS NOT AVAILABLE TO AT-WILL EMPLOYEES.

The Court will dismiss the Complaint's Count V, which is "Retaliatory Discharge Contrary

to Clear Public Policy."  Complaint at 20.  The Complaint's Fifth Count does not name either

Martinez or Salazar.  See Complaint at 20-21.  Further, Lucero clarifies in the Response that Jemez

Cooperative discharged Lucero, and Lucero does not mention Martinez or Salazar.  See Response

at 8.  The Court ordinarily would grant leave to amend, because it is not clear whether Martinez

or Salazar had authority to discharge Lucero or were involved in Lucero's discharge, but the claim

is not available, because of Lucero's employee status. As Lucero acknowledges, retaliatory

discharge is available only for at-will employees, see Gerald v. Locksley, 785 F. Supp. 2d 1074,

1108 (D.N.M. 2011)(Browning, J.), and Lucero is not an at-will employee but "protected under a

just cause standard of a CBA,"  Reply at 7.  See Response at 9.  Thus, the Court dismisses this

claim with prejudice.

> ### D.    LUCERO HAS NOT STATED A CLAIM FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS.

The Court will dismiss without prejudice Count VI, which is intentional infliction of

emotional distress.  Martinez and Salazar first argue that the LMRA's § 301 preempts Count VI.

See MTD at 7.  The LMRA's § 301 provides:

> Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brough in nay district court of the United States having jurisdiction of the parties, without respect to the amount in controversy and without regard to the citizenship of the parties.

29 U.S.C. § 185(a).  The Tenth Circuit has explained that § 301 "preempts questions relating to what the parties to a labor agreement agreed, and what legal consequences were intended to flow from breaches of that agreement, . . . whether such questions arise in the context of a suit for breach of contract or in a suit alleging liability in tort."  Cisneros v. ABC Rail Corp., 217 F.3d at 1302. Accord  Carroll v. City of Albuquerque,  749 F. Supp. 2d 1216, 1223-24 (D.N.M. 2010)(Browning, J.).  The Tenth Circuit has clarified that "[p]reemption arises only when an 'evaluation of the . . . claim is *inextricably intertwined* with consideration of the terms of the labor contract.'"  Mowry v. United States Parcel Serv., 415 F.3d at 1152 (quoting Allis-Chalmers Corp. v. Lueck, 471 U.S).  The Tenth Circuit has decided several times whether the LMRA's § 301 preempts intentional infliction of emotional distress claims against employers.

In Johnson v. Beatrice Foods Co., 921 F.2d 1015 (10th Cir. 1990), an employee alleged a single theory of recovery for intentional infliction of emotional distress under Oklahoma common law.  See 921 F.2d at 1017.  The employee alleged that his supervisor, out of personal hostility, "instituted a campaign of intentional discrimination and harassment with the express purpose of inflicting emotional distress upon [him]" -- including verbal abuse, name calling, discipline that the supervisor knew was unwarranted, and changes to the employee's working conditions.  921 F.2d at 1017-18.  The Tenth Circuit held that § 301 preempted the employee's intentional infliction of emotional distress claim, because the outrageousness of the supervisor's conduct could not be evaluated without resort to the CBA, and because the state law tort did not create an independent method of measuring when an employer's work-related conduct is outrageous.  See 921 F.2d at 1020.  See Mock v. T.G. & Y. Stores Co., 971 F.2d 522, 530 (10th Cir.1992)(citing Johnson v. Beatrice Foods Co., 921 F.2d at 1020 (stating that the Tenth Circuit "has specifically held that claims for intentional infliction of emotional distress are preempted by section 301")).

In Albertson's, Inc. v. Carrigan, 982 F.2d 1478 (10th Cir. 1993), the Tenth Circuit concluded that LMRA § 301 did not preempt an employee's outrageous conduct claim against an employer.  See 982 F.2d at 1482-83.  In that case, the employer, Alberton's, suspended a union employee who was protected by a CBA after she was accused of shoplifting.  See 982 F.2d at 1479. The employee filed a lawsuit against Albertson's and other individual defendants, whom she accused of "unlawfully suspend[ing her] from employment and conspir[ing] to accuse her falsely of shoplifting from her employer, Alberton's."  982 F.2d at 1479.  The employee asserted one claim for "extreme and outrageous conduct," inflicting on her "severe emotional distress."  982 F.2d at 1479.  After the case was removed to district court, the district court concluded that the outrageous-conduct claim actually was two claims: (i) one claim based on suspension; and (ii) one claim based on conspiracy to charge the employee with shoplifting.  See 982 F.2d at 1479.  The district court dismissed the suspension claim, because it concluded that LMRA § 301 preempted the suspension claim, but it concluded that federal law did not preempt the conspiracy claim, because it did not require interpretation of the CBA.  See 982 F.2d at 1479.  The district court remanded the conspiracy claim to state court, because there was no longer diversity jurisdiction. In Benavidez v. Sandia National Laboratories, the Court concluded that LMRA § 301 preempted one intentional infliction of emotional distress claim, but not another intentional infliction of emotional distress claim based on whether the claim required the Court to refer to the collective bargaining agreement.  212 F. Supp. 3d at 1039.

When pleading an intentional infliction of emotional distress claim, the LMRA's § 301 preempts the claim only if the Court is required to refer to the collective bargaining agreement when determining whether the conduct is "outrageous."  Benavidez v. Sandia Nat'l Lab, 212 F. Supp. 3d at 1039 (concluding that LMRA § 301 preempted one intentional infliction of emotional

distress claim, but not another intentional inflection of emotional distress based on whether the claim required the Court to refer to the CBA).  In the Complaint's Count VI, Lucero states only that the Defendants' "conduct" is an intentional infliction of emotional distress and does not specify what that conduct is.  Lucero needs to allege facts for the specific elements so the Court can determine whether it needs to refer to the collective bargaining agreement when assessing the intentional infliction of emotional distress claim.

Further, Lucero needs to allege facts for specific elements so the Court can determine whether there is an intentional infliction of emotional distress claim at all.  In New Mexico, the elements of intentional infliction of emotional distress are: "[(i)] the conduct in question was extreme and outrageous; [(ii)] the conduct of the defendant was intentional or in reckless disregard of the plaintiff; [(iii)] the plaintiffs mental distress was extreme and severe; [and (iv)] there is a causal connection between the defendant's conduct and the claimant's mental distress." Baldonado v. El Paso Nat. Gas Co., 2008-NMSC-005, ¶ 27, 176 P.3d at 283 (internal quotations omitted).  For Lucero's intentional infliction of emotional distress claim against Martinez and Salazar to survive beyond the motion-to-dismiss stage, Lucero must allege specific facts about Martinez' and Salazar' conduct for every element.  Lucero has not alleged any conduct.  Thus, the Court dismisses without prejudice Count VI.

### E.   THE COURT GRANTS LUCERO LEAVE TO AMEND COUNTS III AND VI, BECAUSE IT CONCLUDES THAT AMENDMENT MAY NOT BE FUTILE.

Rule 15(a) provides:

> **(1)   Amending as a Matter of Course.**  A party may amend its pleading

once as a matter of course within:

> **(A)**    21 days after serving it, or

> **(B)**    if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under rule 12(b), (e), or (f), whichever is earlier.

> **(2)**    **Other Amendments.**  In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave.  The court should freely give leave when justice so requires.

Fed. R. Civ. P. 15(a).  "[T]he Rule itself states that leave shall be freely given when justice so requires.  The purpose of the Rule is to provide litigants the maximum opportunity for each claim to be decided on its merits rather than on procedural niceties."  Minter v. Prime Equip. Co., 451 F.3d at 1204.  Under rule 15(a), the court should freely grant leave to amend a pleading where justice so requires.  See In re Thornburg Mortg., Inc. Sec. Litig., 265 F.R.D. at 579-80; Youell v. Russell, No. CIV 04-1396 JB/WDS, 2007 WL 709041, at *1-2 (D.N.M. Feb. 14, 2007)(Browning, J.); Burleson v. ENMR-Plateau Tele. Coop., 2005 WL 3664299, at *1-2.  The Supreme Court has stated that, in the absence of an apparent reason such as "undue delay, bad faith or dilatory motive . . . [,] repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.," leave to amend should be freely given.  Fomen v. Davis, 371 U.S. at 182.  See Curley v. Perry, 246 F.3d at 1284; In re Thornburg Mortg., Inc. Sec. Litig., 265 F.R.D. at 579-80.  A court should deny leave to amend under rule 15(a) where the proposed "amendment would be futile."  Jefferson Cty. Sch. Dist. v. Moody's Inv'r Serv., 175 F.3d at 859 (10th Cir. 1999).  See In re Thornburg Mortg., Inc. Sec. Litig., 265 F.R.D. at 579-80.  An amendment is "futile" if the pleading "as amended, would be subject to dismissal."  In re Thornburg Mortg., Inc. Sec. Litig., 265 F.R.D. at 579-80 (citing TV

Commc'ns Network, Inc. v. Turner Network Television, Inc., 964 F.2d at 1028).  A court may also

deny leave to amend "upon a showing of undue delay, undue prejudice to the opposing party, bad

faith or dilatory motive, [or] failure to cure deficiencies by amendments previously allowed."  In

re Thornburg Mortg., Inc. Sec. Litig., 265 F.R.D. at 579 (quoting Frank v. U.S. W., Inc., 3 F.3d at

1365-66).  See Youell v. Russell, 2007 WL 709041, at *2-3; Lymon v. Aramark Corp., 2009 WL

1299842.

        Refusing leave to amend is generally justified only upon a showing of undue delay, undue

prejudice to the opposing party, bad faith or dilatory motive, failure to cure deficiencies by

amendments previously allowed, or futility of amendment.  See Castleglen, Inc. v. Resolution

Trust Corp., 984 F.2d at 1585(citing Foman v. Davis, 371 U.S. at 182).  Again, the matter is left

to the Court's discretion.  Frank v. U.S. W., Inc., 3 F.3d at 1365-66.  See Duncan v. Manager,

Dep't of Safety, City & Cty. of Denver, 397 F.3d at 1315 (quoting Frank v. U.S. West, Inc., 3 F.3d

at 1365-66, and stating that resolving the issue whether to allow a plaintiff to file a supplement to

his complaint is "well within the discretion of the district court").  "The . . . Tenth Circuit has

emphasized that '[t]he purpose of [rule 15(a)] is to provide litigants the maximum opportunity for

each claim to be decided on its merits rather than on procedural niceties.'"  B.T. ex rel. G.T. v.

Santa Fe Pub. Schs., No. CIV 05-1165 JB/RLP, 2007 WL 1306814, at *2 (D.N.M. March 12,

2007)(Browning, J.)(quoting Minter v. Prime Equip. Co., 451 F.3d at 1204).  "Specifically, the . . .

Tenth Circuit has determined that district courts should grant leave to amend when doing so would

yield a meritorious claim."  Burleson v. ENMR-Plateau Tel. Co-op., 2005 WL 3664299, at *2

(citing Curley v. Perry, 246 F.3d 1284).

        The Court grants Lucero leave to amend Counts III and Count VI, because, Lucero may be

able to cure the Counts' insufficiency.  See Amaro v. New Mexico, 737 F. App'x 882, 883 (10th

Cir. 2018)(unpublished)(concluding that, because the plaintiff could amend the complaint to make it more specific, the district court should have granted the plaintiff leave to amend). For Count III, which is the prima facie tort claim, Lucero must make specific allegations for each element of a prima facie tort: "'(i) commission of an intentional, lawful act; (ii) an intent to injure the plaintiff; (iii) injury to the plaintiff as a result of the intentional act; and (iv) the absence of sufficient justification for the injurious act.'" Simon v. Taylor, 252 F. Supp. 3d at 1232. Further, now Lucero alleges unlawful conduct -- negligent supervision, hiring, and retention. He must pay careful attention to the elements and allege lawful conduct to fulfill the first element of a prima facie tort. Further, he does not name Martinez and Salazar in his Count III, and he must mention them specifically and what their specific conduct was if his new claim is to survive dismissal.

For Count VI, Lucero must allege specific facts for each element of an intentional infliction of emotional distress claim: "[(i)] the conduct in question was extreme and outrageous; [(ii)] the conduct of the defendant was intentional or in reckless disregard of the plaintiff; [(iii)] the plaintiffs mental distress was extreme and severe; [and (iv)] there is a causal connection between the defendant's conduct and the claimant's mental distress." Baldonado v. El Paso Nat. Gas Co., 2008-NMSC-005, ¶ 27, 176 P.3d at 283 (internal quotations omitted). He must also name Martinez and Salazar in this Count and ensure that there are specific allegations against them to survive dismissal. The Court will grant Lucero leave to amend his Complaint within fourteen days of the filing of this Memorandum Opinion and Order.

The Court notes that Lucero must ensure that his amended Complaint will meet the standards of rule 11 of the Federal Rules of Civil Procedure. See Hughes v. City of Fort Collins, Colo., 926 F.2d 986, 989 (10th Cir. 1991). Rule 11 provides that when an attorney presents a pleading to the Court, that attorney is certifying to the best of his or her knowledge, that "the

claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law" and that "the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery."  Fed. R. Civ. P. 11 (b)1, 3.  Thus, when Lucero submits the amended Complaint, he is certifying that his pleading meets these standards.

## II.    THE COURT DENIES THE MOTION FOR DEFAULT, BECAUSE OF THE SHORT TIME OF THE DELAY, THE COMMUNICATION BETWEEN THE PARTIES, AND THE LACK OF PREJUDICE TO SALAZAR.

The Court finally denies the Motion for Default.  The text of rule 55(a) of the Federal Rules of Civil Procedure states that, "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default."  Thus, rule 55(a) is written in general terms broader than "defendant," and the Court concludes that the terminology encompasses counter-defendants, which means that a counter-plaintiff must seek the clerk's entry of default again the counter-defendant.  Salazar entered a Motion for Default against Lucero with the Court without seeking entry of default from the Clerk of the Court as rule 55(a) requires.  See Motion for Default at 1; June 25 Tr. at 43:16-23 (Court, Martinez).  Regardless, even if rule 55(a) did not require Salazar to first seek entry of default with the Clerk, the Court still would deny the Motion for Default.  The parties were in communication during this delay.  See June 25 Tr. at 44:17-46:22 (Salcedo, Court)(noting that Lucero's counsel had been in contact with Martinez' and Salazar's counsel regarding a filed copy).  Further, Salazar has not alleged any prejudice from the delay in the filing. See Motion for Default at 2-3.  The Court thus denies the Motion for Default.

**IT IS ORDERED** that: (i) Counter-Plaintiff Salazar's Motion for Default Judgment, filed April 7, 2020 (Doc. 14)("Motion for Default") is denied; (ii) Defendants Martinez and Salazar' [sic] Partial Motion to Dismiss and Memorandum in Support Thereof, filed April 13, 2020 (Doc. 4)("MTD") is granted; and (iii) Motion to Amend Petition, filed June 24, 2020 (Doc. 37) is granted as to Counts III and Count VI.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Betsy R. Salcedo
Salcedo Law PC
Albuquerque, New Mexico

    *Attorneys for the Plaintiff*

Lorna M. Wiggins
Wiggins Williams & Wiggins PC
Albuquerque, New Mexico

    *Attorneys for the Defendants Donna Montoya-Trujillo,*
    *Dwight Herrera, and Randy Vigil*

Jonlyn M. Martinez
Law Firm of Jonlyn Martinez
Albuquerque, New Mexico

    *Attorney for Defendants Alfonso Martinez, Jr. and Carlos Salazar*